Mary **BROWER** et al.

v.

Helene **WOHLGEMUTH** et al.

**Civ. A. No. 74–71.**

United States District Court,
E. D. Pennsylvania.

Feb. 7, 1974.

David A. Scholl, Richard S. Packel of Del. County Legal Assistance Assn., Chester, Pa.; Jonathan M. Stein, Thomas G. Linsley of Community Legal Services, Philadelphia, Pa., for plaintiffs.

Cecil Maidman, Michael Minkin, Asst. Attys. Gen., Philadelphia, Pa., for the Commonwealth of Pennsylvania.

## AMENDED OPINION *

HIGGINBOTHAM, District Judge.

The instant case demonstrates once again the paradoxes within the spectrum of the practical application of the computer sciences. At its best, the computer has enabled NASA to send men on lunar missions zooming 238,857[1] miles into outer space so that they may land softly on the moon and return safely with pinpoint landings despite reentry speeds of 25,000 miles per hour. For computer science application at its worst, Pennsylvania's Department of Public Welfare (DPW) could not master the less dramatic task of assuring a proper disbursement of checks to 3,502 deserving recipients in the counties of Allegheny, Dauphin, Delaware and Philadelphia.

Though all parties profess their good intentions to fairly correct the impact of the computer program errors of December 31, 1973 involving 3,502 welfare recipients, it appears to be impossible to issue a decree which flawlessly unravels the errors; I cannot simultaneously (1) assure that no deserving recipient will be deprived of funds due him or her and (2) also assure that the Commonwealth will not have to make unnecessary duplicate payments to some individuals who are not in actual "need"[2] of the extra payment. Because of the factual penumbras[3] of this record and as a consequence of the Court of Appeals January 28, 1974 stay of Chief Judge Marsh's January 24, 1974[4] injunction,

---

* Due to the extraordinary time pressures the original opinion was filed on February 6, 1974 at 4:58 p. m. without having even the opportunity to proofread it. In view of the fact that the Court of Appeals has listed for argument the companion case of Brown et al. v. Helene Wohlgemuth et al., C.A. 74–45 (W.D.Pa. Jan. 24, 1974) for Monday, February 11, 1974, I thought that it was better for the parties to fully understand my intentions, reasoning, and the nature of the order which I was entering, rather than to delay the matter another day. The changes in this amended opinion are miniscule, in the nature of form and not of substance, except as to footnote 16, lines 10 through 18, the latter having been added to make clear this court's desire to avoid any conflict with Chief Judge Marsh's order or the related stay of the Court of Appeals order.

1. For those versed in interplanetary phenomena, I know that 238,857 miles is merely a mean distance due to the elliptical orbit of the moon about the earth.

2. Of course I recognize that most persons on public assistance are by definition destitute and in need, and, accordingly, could make excellent use of an extra check. But by "need" as used here, I am defining that category of persons who, with good cause, spent the duplicate check of December 31st thinking "they were entitled to both checks" (see Stipulation of Facts, ¶ 8) and as a result of that assumption were expecting and needed their January 15th check for their actual subsistence needs. See affidavits of the original plaintiffs, Brower, Brown,

Haynes and White; Plaintiffs' Complaint, ¶¶ 10–36.

3. See Stipulation of Facts, ¶¶ 6–8 and N.T. of February 1, 1974.

4. As the result of a similar suit involving digit "0" persons (see pp. 865–866, infra) in Pittsburgh, in the United States District Court for the Western District of Pennsylvania, Chief Judge Marsh granted on January 18, 1974 a temporary restraining order requiring the state to make the January 15th payment despite the duplicate payments of December 31st. While Chief Judge Marsh's order involved only those persons who were on Aid to Families with Dependent Children (AFDC), his case seems to be factually indistinguishable from the instant case. As to most of the recipients in this case it is admitted in the defendants' brief at page 2 that 2,184 of the persons in Delaware, Philadelphia and Dauphin counties are also AFDC recipients. On January 24, 1974, Chief Judge Marsh issued a preliminary and permanent injunction requiring the defendants to "forthwith" deliver the regularly scheduled grant check due on January 15, 1974 to the entire class. The defendants filed an appeal to the Court of Appeals with motions for emergency consideration and for a stay of Chief Judge Marsh's order. On January 28, 1974 the Court of Appeals stayed Chief Judge Marsh's order. As noted infra, it is my view that for me to now issue a class action injunction, the scope of Chief Judge Marsh's would constitute a lower court's improper disregard of the rationale of the Court of Appeals' stay; thus, my de-

at best I can only issue an order which gives rough justice—recognizing that perhaps some, though probably not many,[5] innocent persons may be hurt by my refusal to give a sweeping injunction, as did Chief Judge Marsh, requiring a January 15th payment to the entire class. Apparently the computer and management systems are not so programmed that I can obtain answers as to each specific individual and thereby carve out an order devoid of suppositions.[6] Despite any purported good intentions of the defendants to retrieve the totality of data needed for my precise adjudication of the facts on *each* recipient's claim, defendants seem to be not much more effective in giving me the information needed as to *each* individual than were the efforts of all the King's horses and all the King's men to put Humpty Dumpty together again.[7]

## II.

New Year's Eve, December 31, 1973, brought a pleasant surprise to approximately 3500 Pennsylvania welfare recipients and a traumatic shock to the personnel of the DPW's data processing units. The drama began to unfold some weeks before. On October 1, 1973, the DPW initiated in Delaware County for the first time a digital payment system, incidentally a system which at an earlier date I had (perhaps too optimistically) described as a "modern computer check processing system."[8] Under the digital payment system, rather than all persons being paid on the 1st and the 15th of the month, DPW semi-monthly allotments are spread out so that various recipients are paid on different days; the

date of payment is determined by the last digit of the payee's Department of Public Welfare case number. Thus, in this case, those persons whose last digit was "0" were to receive checks on December 31, 1973 and January 15, 1974. In November, 1973 in some of the counties, the DPW had switched to a "bank issuance" program whereby the welfare checks are sent directly to the local bank to be picked up there by the recipients. The bank issuance program was designed to eliminate mail theft and other problems of unpredictable delivery. Additionally, in December, 1973, the DPW was involved with "the switchover involving thousands of recipients to the new supplemental security income program, providing generally higher grants to recipients" which was to take "place on a state wide basis on January 1, 1974." See Stipulation of Facts, ¶ 5.

For some reason the computer system programmers, when attempting to integrate the above three modifications, failed to terminate the old program under which the digit "0" individuals had checks sent to their homes. The digit "0" persons had been previously informed that commencing December 31, 1973 they must pick up their checks at the bank instead of receiving their check by mail at home. Thus, on the morning of December 31, 1973, many recipients were awaiting the opening of the bank doors. They received their checks promptly and after arriving home, to their surprise found an additional check for the same amount in their mail. At this point, some recipients thought it was a bonus and it is stipulated that some thought "that they were entitled to

cree has been issued with a sincere effort to avoid breaching the deference required of an appellate decree within the same circuit.

5. By my analysis of the supplemental affidavits filed, there were at least 26 persons who received only *one* check on December 31, 1973 and yet still did not receive the January 15 check. I have no way of knowing how many others suffered a similar plight, but perhaps because of a feeling that "you can't beat City Hall" or a lack of in-

formation as to the temporary restraining orders in this case, some may have assumed that there was no remedy available to assure them of the January 15 check.

6. See N.T. of February 1, 1974 at 4.

7. See N.T. of February 1, 1974 at 4 & 8.

3. Delaware County Welfare Rights Organization et al. v. Helene Wohlgemuth, 369 F. Supp. 1381 (E.D.Pa.1974) at 1382.

both checks."[9] Some believed otherwise. Some immediately returned the extra check to their local office of DPW. Others followed the classic self-help doctrine of "finders keepers".

Sometime during the morning of December 31st, the panic button was pushed in Harrisburg upon learning that their supreme inanimate robot—the computer—had followed precisely the programmed instructions they gave it. Accordingly messages were sent out instantly to all of the banks to not release any further checks still in the possession of the banks. The 3,502 recipients were advised "no earlier than January 11, 1974" that their January 15th checks would not be available.[10] See Stipulation of Facts, ¶ 4 and attached Exhibit "A".

### III.

At first blush, it would seem easy to find a fair resolution to this problem. However, like many problems perceived as uncomplex, the simplistic solution is partially dependent upon whose lens one uses to view and analyze the problem. For here there are two significantly different perspectives, neither of which is patently unreasonable.

*Position A*—The Rationale of the Commonwealth:

It is unconscionable for anyone to keep that which is not his, and particularly when one has received a "government benefit" paid in error. Certainly the Commonwealth should be able to correct its blatant error and not have to issue additional checks on January 15th and therefore unnecessarily deplete the Commonwealth's limited resources. Moreover, no one would suffer. If the error of duplicate payments can be corrected by withholding the January 15th payment, the Commonwealth will not have "thrown away" $300,000 by reason of a programmer's error. The recipients should not scream "injustice" because they were indeed fortunate to receive prematurely their entire payments for the month of January on December 31st rather than to have it bifurcated with payments on December 31st and January 15th.[11]

*Position B*—The Rationale of the Plaintiffs:

Plaintiffs argue that this is not a case of first impression, for a three judge court of this circuit, in Cooper v. Laupheimer, 316 F.Supp. 264 (E.D.Pa.1970) has previously dealt with the identical problem of duplicate payments by the DPW. Plaintiffs assert that in *Cooper, supra,* the court enjoined the defendants specifically from ever again utilizing the procedure it did in fact use in this case in January 1974. They rely, *inter alia,* on the language of the *Cooper* opinion which ". . . ordered that defendants be enjoined from seeking restitution of duplicate assistance payments by reducing current grants of AFDC to plaintiffs and their class". *Id.* at 270. Furthermore, plaintiffs contend the denial of the January 15th payment is repugnant to the rationale of Caldwell v. Laupheimer, 311 F.Supp. 853 (E.D.Pa. 1969), which held:

"That due process requires a hearing prior to the termination of public assistance is too clear to merit extended discussion. * * * [P]rocedural fairness requires the notice must be timely and adequate, given within a reasonable time prior to the taking of any action, and specifying the proposed action and the grounds therefor, indicating the information needed to determine eligibility and advising the recipients of the right to be heard and to be represented by counsel." Id. at 855, 856.

---

9. Stipulation of Facts, 8.

10. Nonetheless, the Commonwealth concedes that four days were needed to program the computer for sending out the January 15th checks. N.T. of February 1, 1974, at 9.

11. Defendants' Brief, p. 3: ". . . it is defendants' contention that the payments in this action were prior or advance rather than duplicate."

A final contention of the plaintiffs is that welfare recipients may not be subjected to any traditional "set off" doctrines because of the very nature of the recipients' poverty; to do otherwise ". . . fails to recognize the reality of public welfare—the *necessity of current payments for current needs.* The state has a duty to see that the child's current needs are met. *It cannot avoid this responsibility by arguing that it has fulfilled a past need."* Cooper v. Laupheimer, *supra,* 316 F.Supp. at 269 (Emphasis added).

## IV.

### The Different Impacts of the Withholding of the January 15th Checks on Three Different Subgroups

The tragedy of the January 15th withholding of checks to the 3,502 recipients is that the Commonwealth presupposes that there is no difference in the circumstances among any of the recipients. It further assumes they all received two checks and that there could be no legitimate reason for any of the individuals who received a duplicate payment to have spent it in good faith while fully expecting the January 15th check. However, the actual record does not substantiate the above suppositions as to some of the 3,502 recipients, for within this class of 3,502 persons there are three separate subgroups which have sustained different fates as a result of the withholding of the January 15th checks.

### Subgroup A:

"One-check persons"—Some of the persons in this class of 3,502 received only *one* check on December 31st and not two checks as the Commonwealth suspects. This latter fact is stipulated to by the Commonwealth.[12] However, despite this subgroup's total innocence they have been cut off from their January 15th check. Unfortunately, *even now* we cannot identify specifically all of these

persons. Some of these persons may have received a check at the bank but did not have one mailed to their home.[13]

Yet for this group of persons who in fact did not receive duplicate checks on December 31, 1973, some of these individuals have filed affidavits stating that as late as February 2, 1974 they still have not received their January 15th check.

### Subgroup B:

Some of the persons who received two checks on December 31st spent both in good faith because they *"thought, erroneously or not, that they were entitled to both checks"* (Stipulation of Facts, ¶ 8), and thus for that reason were expecting the regular January 15th check since they had made expenditures for other necessities. Each of the four original plaintiffs filed sworn affidavits which would justify me in finding that their expenditure of the duplicate check of December 31st was made in good faith and that they had reason to believe that the "duplicate check" was an additional reimbursement to which they were entitled because of prior communications with representatives of DPW.

As an example, Mary Brower, in her affidavit asserts that she picked up her semi-monthly check at the bank and on the same day received another check of $234 in the mail: "As soon as she received it, she telephoned her caseworker at the Delancey District office of the Philadelphia County Board of Assistance, 44th & Chestnut Streets, Philadelphia. When she could not reach her caseworker, she spoke to another employee who advised her to do whatever she wished with it.

"Consequently, Brower expended both checks, as she had numerous pressing obligations, such as a deficiency in her mortgage back bills to the electric, gas and telephone companies, bills from Christmas shopping, and her purchase of

12. Stipulation of Facts, ¶ 7.

13. See footnote 14, *infra,* and accompanying text.

her semi-monthly food stamp allotment of $62.50.

"Brower had received no prior notice that she would not receive her January 15, 1974 check, and relied upon it for making her mortgage payment, purchasing food stamps and making a payment on her gas bill." (Complaint ¶¶ 12, 13 and 15).

Isabella Brown in her affidavit avers:

"Brown's assistance check had been reduced several months before, allegedly because her dependent daughter, JANICE, had turned 18, and she was too old to be included on Brown's check. Brown figured that this extra check was to make up for payments which she should have received for JANICE.

"Brown expended the sums of both checks, for her rent, insurance payment, food purchases, and payments on her refrigerator and television.

"Brown had received no prior notice that she would not receive her January 15, 1974 check, and relied upon it to purchase food; for transportation to the doctor for treatment of her chronic high blood pressure condition and occasional seizures of undetermined origin; and to recover clothes which the cleaner threatens to sell if her bill is not paid." (Complaint ¶¶ 19, 20, and 22)

Plaintiff Irene Haynes stated:

"On December 31, 1973, plaintiff IRENE HAYNES (hereinafter 'Haynes') picked up her semi-monthly assistance payment of $104.00 from her bank.

"Later that day, Haynes received a check for the amount of $104.00 in the mail.

"In November, 1973, Haynes had a baby, and she had requested that her grant be increased for this child. She was informed that, since the child's father was in the armed forces, she would receive support from him, and would not obtain an increase. She had, however, only received $30.00 from him to date, and concluded that this payment represented a response to her request for an increase.

"Haynes had received no prior notice that she would not receive her January 15, 1974 check, and needs it to purchase food stamps or food, and to make back payments on telephone and electric bills, and two furniture bills several months delinquent." (Complaint ¶¶ 24, 25, 26, and 29).

Plaintiff Gwendolyn R. White asserted:

"On December 31, 1973, plaintiff GWENDOLYN R. WHITE (hereinafter 'White') picked up her $97.80 semi-monthly assistance supplement to her husband's social security disability benefits from her bank.

"When she arrived home, White discovered that she had been mailed a check for $97.80.

"White's check had, in the past month, been reduced, and she concluded that this check represented an attempt to catch up past reductions.

"White utilized the one grant to purchase food for her family of 11 members and to pay a back telephone bill. She utilized the other mostly to purchase food stamps, for which she must pay $90.00 semi-monthly, and which she has since used to purchase food.

"White had received no prior notice that she would not receive her January 15, 1974, check, and needs it to purchase more food stamps and/or to pay an electric and gas bill for which she has received a Disconnection Notice." (Complaint ¶¶ 31–34, 36).

*Subgroup C:*

Some of the persons who received both checks, recognizing that the duplication was due to an error, may not have spent all of the proceeds. Perhaps they could survive without any greater hardship than they would have sustained if they had received only one check on December 31st and one on January 15th. Accordingly, for the persons in Subgroup C, there is no compelling economic necessity that they receive the January 15th check.

Although I have delineated and defined the above three subgroups, the record does not indicate the respective subgroup in which each of the 3,502 recipients belongs. Therefore from the standpoint of fashioning an appropriate remedy, the court finds itself limited in terms of the scope of the relief it can grant, particularly in view of the Court of Appeals' stay and the inadequate data supplied by the Commonwealth.

## V.

The Class Action Issue, The Court of Appeals' Stay of Chief Judge Marsh's order, and This Court's Handling of the Scope of the Temporary Restraining Order and the Preliminary Injunction Decree.

It is always difficult to ascertain whether a few plaintiffs are truly representative of a class, and whether the class is so numerous that joinder of all members is impracticable in order to have compliance with Rule 23 of the Federal Rules of Civil Procedure. When the complaint was filed, it was evident that there could be a significant injustice as to the four named plaintiffs; thus a temporary restraining order was granted in their behalf requiring the January 15th check to be sent to them. Without the January 15th check, they would be totally destitute. However, I refused to grant a temporary restraining order for the entire class, which is now alleged by plaintiffs to comprise 3,502 recipients. Nonetheless, in my chambers I advised the plaintiffs that I would grant further restraining orders if any welfare recipient filed an affidavit noting his particularized need and it was similar to the affidavits filed by the four original plaintiffs. The Commonwealth informally agreed that upon the filing of those affidavits the affiants could then immediately receive their January 15th checks. *Unfortunately, this agreement has not been implemented as to all of the individuals who filed the prerequisite affidavits since some still have not received their January 15th check.* As of February 1, 1974, 151 persons have been added as named plaintiffs and have filed the requisite affidavits. Indicative of the tragedy of the Commonwealth's ineptness when dealing with destitute individuals is its slowness to respond even to those persons whose particularized affidavits had been presented to it.

My brief analysis indicates that as of the time the affidavits were taken there were at least 26 persons who had not received duplicate checks on December 31st but yet still had not received their checks of January 15th.[14] The tragedy of these 26 recipients is that they have committed no error, have received no extra funds; their only "fault" is their poverty, therefore they are unavoidably vulnerable to the DPW's bungling of the computer process.

The Commonwealth's only legal defense rests upon its characterization of the mistaken payment of December 31st as an advance by the DPW against the normal January 15th allocation to these recipients. This characterization gives little solace to those recipients who did not in fact receive such an "advance" on December 31st but who nonetheless were denied payment on January 15th by the DPW in its feverish attempts to protect its budget. Similarly, it does not justify the suspension of the January 15th payment to those recipients who acted in good faith but were misled by the duplicate issuance of the welfare checks through the mail and thus found themselves unable to meet current subsistence needs in the second half of January.

14. See affidavits of James Green, Maxine Bolden, Maxine Smith, George Minnicks, Larry McCrae, Mary Watson, Juanita Ross, Nannette Jones, Mary Douglas, Norma Smith, Phyllis Garett, Margine Bledsoe, Phyllis Johnson, Antoinette Whitehead, Pauline Murphy, Viola Simpson, Frances Vandergrift, Rebecca B. Parham, Julia H. Cooper, Ruebell Miller, Sandra Teachey, Ethel Edwards, Lorraine Mitchell, George Dembry, Lucille Gordon, Betty Darden.

■ The three decisions of Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Cooper v. Laupheimer, 316 F.Supp. 264 (E.D.Pa.1970); and Caldwell v. Laupheimer, 311 F.Supp. 853 (E.D.Pa. 1969) at least require that the Commonwealth's procedures comport with minimal due process requirements of the Fourteenth Amendment. These three rulings recognized the crucial significance of public assistance and the dire consequences attendant to the termination or reduction or withholding of that assistance. The rationale propounded by the plaintiffs must be adopted here, since to do otherwise would clearly ignore the underlying realities of the affected persons and their beneficiaries.

■ Goldberg, Cooper, and Caldwell, supra, can be read to hold that the Commonwealth must provide timely and adequate notice to each recipient prior to the termination, reduction, suspension or withholding of that assistance. These decisions additionally command that the recipient will be afforded an evidentiary hearing at which he or she can, with or without the benefit of counsel, present orally any evidence; confront, cross-examine and rebut adverse witnesses; and similarly propound any argument in his or her behalf evidencing, among other things, good faith reliance, mitigating or extenuating factors, destitution, or particularized undue financial hardship.

As previously mentioned in footnote 4, supra, I feel obliged to defer to the stay by the Court of Appeals of Chief Judge Marsh's order; thus this deference necessarily limits the scope of the relief which I can grant temporarily and preliminarily.

Chief Judge Marsh of the United States District Court for the Western District of Pennsylvania, thought that Goldberg, Cooper and Caldwell, supra, required him to issue a temporary restraining order for all AFDC Allegheny County recipients from whom the Commonwealth threatened to withhold January 15 checks. His ruling was pointed and unequivocal:

"The State cannot withhold or suspend grants of aid to needy, dependent children in order to recoup prior duplicate assistance payments made in error by the State, even if the parent or other eligible recipient has fraudulently acquired the duplicate payment. Cooper v. Laupheimer, supra [316 F. Supp.], at 270. [Conclusion of Law No. 9]

\* \* \* \* \* \*

"The defendants and the State Department of Welfare have adequate remedies for preventing losses arising from the erroneous issuance of duplicate December 31, 1973 A.F.D.C. grant checks either by recoupment procedure which provides plaintiffs and their class procedural due process and is consistent with the Social Security Act of 1935, supra, or by following the restitution procedures set out in the Pennsylvania Department of Welfare Manual culminating in Civil proceedings against the recipient." [Conclusion of Law No. 12] Slip Opinion of Chief Judge Marsh in Brown et al. v. Helene Wohlgemuth et al., C.A. 74–45) (W.D.Pa. January 24, 1974) at 10–12.

Chief Judge Marsh issued a Temporary Restraining Order on January 18th for class relief precluding the defendants from withholding the January 15th check and on January 24th he granted a preliminary injunction covering the class as previously noted.[15]

But the Court of Appeals apparently has not found the relevant cases to be as persuasive as did Judge Marsh and thus

---

15. He also fined Helene Wohlgemuth, Secretary of the Department of Public Welfare and Edward Kalberer, Executive Director of the County Board of Assistance each $1000 for failing to comply with his prior temporary restraining order. No comments made in this opinion are meant to indicate that I am in agreement or disagreement with Chief Judge Marsh's fines on Wohlgemuth and Kalberer, since obviously I do not know enough of the facts of record as to whether the conduct of the individual defendants was of sufficient gravity to require the imposition of a fine.

on January 28, 1974 they stayed Judge Marsh's order.

■ Even though I may have been inclined to issue a class injunction with the breadth of Judge Marsh's such an injunction now could be construed to be a flouting of the stay order of the Court of Appeals—I can perceive no reason why a welfare recipient in Philadelphia should be treated differently than a welfare recipient in Allegheny County on the same factual situation. Accordingly, I will not issue an injunction which is incongruous with the stay order of the Court of Appeals.

Moreover, the factual record supplied by the Commonwealth is not in any way comprehensive enough to enable me to act with the precision and the assurance I would desire. Therefore, to avoid the bearing of any economic hardship by the plaintiffs and yet not granting the broad relief of ordering immediate payment of the January 15th check to the entire class, I am requiring the Commonwealth to notify each of the 3,502 recipients advising each of them that upon a particularized showing of need by affidavit, the Commonwealth will forthwith remit to them their January 15th check.

■ I recognize that in *Cooper, supra,* only AFDC parents were embraced within that decree. The similarities however in the *ratio decidendi* of *Cooper* convince me that economic hardship, where established, should not deprive a recipient of aid merely because it was labeled General Assistance (G.A.) in lieu of AFDC. The Commonwealth, in its eagerness to reduce its overpayments cannot elevate itself above binding court rulings. One cannot obscure the reality of the significance of the timely receipt of public assistance by the recipients, particularly when it is demonstrated that these persons, in some instances, were legally and factually entitled to those sums, and in other cases, they were equitably eligible to receive said sums.

Of course, I recognize that there might be instances where the amount of the duplicate payment was so inflated that no person could reasonably believe he was entitled to the receipt of said sums and that obviously there was an error committed, *e.g.,* receipt of a check made out in the amount of $1,000 or $500.00 instead of one in the amount of $100; however, the instant case does not reach such magnitude of error as to be differentiated from *Cooper, supra.*

Perhaps the administrative errors of DPW and its subsequent attempts to rectify those mistakes were caused by well meaning persons traveling the high road of good intentions. But good intentions are not the equivalent of food for the stomach, heat for the home, or clothing for the body. The courts have recognized that, for the poor, administrative "bungling" is more than a mere "happening"; it can be a total crisis. Accordingly, the state cannot peremptorily correct its past errors as if one were dealing with stones and rocks.[16]

### PRELIMINARY INJUNCTION ORDER

This cause came to be heard on plaintiffs' motion for preliminary and permanent injunction and summary judgment

---

16. The decree I am fashioning is a sincere effort on my part to reconcile several divergent factors, including an appropriate accommodation of (1) the persuasive legal precedents; (2) the questionable conduct of the DPW in unilaterally correcting its mistakes; (3) the exigent financial circumstances of some of the parties, and (4) deference to a stay by the Court of Appeals of a ruling in a companion suit initiated in the Western District of Pennsylvania before Chief Judge Marsh.

Apparently some of the 3,502 persons referred to in this opinion might also be A.F.D.C. recipients living in Allegheny County. By the attached order, *I do not intend for this Order to be operative as to any of those A.F.D.C. recipients included within Chief Judge Marsh's order or who are within the scope of the Court of Appeals' stay order.* Stipulation of Fact, ¶ 1 notes that there were 614 recipients in Allegheny County, but the record does not reveal how many, if any, of the 614 are A.F.D.C. recipients.

This opinion constitutes my findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

and this Court having considered the verified complaint, answer, motion to intervene and affidavits of 151 plaintiff members of the class, stipulation of facts, briefs and argument of counsel, and it appearing to this Court that the defendants have withheld the regularly scheduled public assistance check of January 15, 1974 from plaintiffs comprising 3,502 households and will continue to withhold said checks to the irreparable harm and injury of plaintiffs, it is ordered, that defendants, their successors in office, their agents, servants, employees, attorneys, and those persons in active concert or participation with them:

1. Immediately identify, notify, as specified below, and pay to those public assistance recipients whose Department of Public Welfare case number ends in the digit "0" and who neither received a duplicate public assistance check on or around December 31, 1973, nor a regular public assistance check on January 15, 1974, one check in the amount they should have received on January 15, 1974.

2. Immediately identify and notify, as specified below, those public assistance recipients whose Department of Public Welfare case number ends in "0", who received a duplicate assistance payment on or around December 31, 1973, and who did not receive a regularly scheduled assistance payment on January 15, 1974. The members of this group who in good faith spent their duplicate check in reliance upon the receipt of the regularly scheduled public assistance check on January 15, 1974, and who suffered hardship as a result of its non-receipt are to be paid the amount they would normally have received on January 15, 1974 on the following condition. In order to establish their hardship and good faith spending of the two checks before January 15, 1974, the members of this group will be immediately notified to come into their local welfare office to sign the affidavit, attached hereto as Appendix 1, and note the particularized need and hardship. The recipient shall be provided a copy of the affidavit for his or her own records and shall not be charged for the notarization of the affidavit.

3. The Department of Public Welfare and defendants shall immediately notify by first class mail all members of the class of approximately 3,502 individuals who failed to receive their January 15, 1974, public assistance checks and shall inform them strictly as follows:

"As a result of a federal court order in Philadelphia we have been ordered to notify you of what may be your rights to the public assistance check which we suspended on January 15, 1974:"

"a. If you did not receive your January 15th check and received and cashed but *one* check at the end of December, 1973, come into your local welfare office as soon as possible with this notice to receive an immediate replacement check for the January 15th check;"

"b. If you did not receive your January 15th check and received and cashed *two* assistance checks at the end of December, 1973, come into your local welfare office as soon as possible with this notice.

"To receive a check you must sign an affidavit or sworn statement that you spent both checks before January 15th thinking you would be receiving the January 15th check, and also you must establish your particularized need and hardship.

"c. If you have any problem or delay in getting your replacement check call [insert name and phone number of county legal services program] where a lawyer can assist you in this matter."

4. Defendants shall file, by 3:00 P. M. Monday, February 11, 1974, with this Court and counsel for plaintiffs affidavits showing full compliance with this order, including proof that notice was actually sent to all 3,502 individuals and households in the class, the form of notice actually used, and the form of the affidavit to be used. In addition, defendants must show that all the named

plaintiffs have actually received their replacement for the January 15, 1974, in accord with the earlier Orders of this Court.

5. Defendants shall also file bi-weekly affidavits with this Court, beginning February 23, 1974, showing dispatch by defendants and receipt of the payments to the individuals identified in paragraphs 1 and 2 *supra*.

6. No security shall be required of plaintiffs as they are proceeding *in forma pauperis* pursuant to 28 U.S.C. § 1915.

### APPENDIX I
### JANUARY 15, 1974 REPLACEMENT CHECK AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA ⎱ SS
COUNTY OF                       ⎰

I,                 , being duly sworn according to law depose that:

1. I live at

2. My Department of Public Welfare case number is:

3. On or about December 31, 1973, I received two public assistance checks both of which I spent because I was expecting another check on January 15, 1974.

4. I did not receive a public assistance check on January 15, 1974.

5. As a result of not receiving an assistance check on January 15, 1974, I have suffered the following hardship and injury:

6. The reason why I spent the duplicate check of December 31, 1973 was:

7. I spent the duplicate check of December 31, 1973 for:

_____

Sworn to and Subscribed
before me this        day
of              , 1974.

_____
Notary Public