**Arlene MATTERN, on behalf of herself and all others similarly situated, Appellee,**

v.

**Caspar W. WEINBERGER, Secretary of Health, Education and Welfare, Appellant.**

**No. 74–1776.**

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1975.

Decided June 3, 1975.

---

Eugene F. Zenobi, Reading, Alan N. Linder, Lancaster, for appellee.

Carla A. Hills, New York City, Robert E. J. Curran, Robert E. Kopp, Robert S. Greenspan, Dept. of Justice, Washington, D. C., for appellant.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

HUNTER, Circuit Judge:

This appeal involves a challenge to the constitutionality of the procedure established by the Secretary of Health, Education and Welfare, pursuant to section

204 of the Social Security Act,[1] for the recoupment of alleged overpayments of benefits. The district court, 377 F.Supp. 906 (E.D.Pa., 1974), found the recoupment procedure violative of due process since it permitted an adjustment or reduction of social security payments without affording the beneficiary the right to a prior oral hearing. While we are in substantial agreement with the opinion of the district court, we vacate and remand for entry of a new order consistent with this opinion.

1. 42 U.S.C. § 404 (1970):

(a) Whenever the Secretary finds that more or less than the correct amount of payment has been made to any person under this subchapter, proper adjustment or recovery shall be made, under regulations prescribed by the Secretary, as follows:

(1) With respect to payment to a person of more than the correct amount, the Secretary shall decrease any payment under this subchapter to which such overpaid person is entitled, or shall require such overpaid person or his estate to refund the amount in excess of the correct amount, or shall decrease any payment under this subchapter payable to his estate or to any other person on the basis of the wages and self-employment income which were the basis of the payment to such overpaid person, or shall apply any combination of the foregoing.

. . .

\* \* \* \* \* \*

(b) In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

2. "Fault" is defined in 20 C.F.R. § 404.507, which provides:

"Fault" as used in "without fault" (see §§ 404.506 and 405.355) applies only to the individual. Although the Administration may have been at fault in making the overpayment, that fact does not relieve the overpaid individual or any other individual from whom the Administration seeks to recover the overpayment from liability for repayment if such individual is not without fault. In determining whether an individual is at fault, the Administration will consider all pertinent circumstances, including his age, intelligence, education, and physical and mental condition. What constitutes fault

# I. RECOUPMENT PROCEDURE

Section 204(a) of the Act directs the Secretary to recover overpayments of social security benefits through recoupment of future benefit payments. Section 204(b), however, requires the Secretary to "waive" recoupment under certain circumstances. It provides that there shall be no recoupment where the overpaid beneficiary is "without fault"[2] and the recoupment either would "defeat the purpose" of Title II of the Act[3] or

(except for "deduction overpayments"—see § 404.510) on the part of the overpaid individual or on the part of any other individual from whom the Administration seeks to recover the overpayment depends upon whether the facts show that the incorrect payment to the individual or to a provider of services or other person, or an incorrect payment made under section 1814(e) of the Act [42 U.S.C. § 1395f(e)], resulted from:

(a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or

(b) Failure to furnish information which he knew or should have known to be material; or

(c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect.

3. The phrase "defeat the purpose" of Title II is defined in 20 C.F.R. § 404.508, which provides:

(a) General. "Defeat the purpose of title II [42 U.S.C. § 401 et seq.]," for purposes of this subpart, means defeat the purpose of benefits under this title, i. e., to deprive a person of income required for ordinary and necessary living expenses. This depends upon whether the person has an income or financial resources sufficient for more than ordinary and necessary needs, or is dependent upon all of his current benefits for such needs. An individual's ordinary and necessary expenses include:

(1) Fixed living expenses, such as food and clothing, rent, mortgage payments, utilities, maintenance, insurance (e. g., life, accident, and health insurance including premiums for supplementary medical insurance benefits under title XVIII [42 U.S.C. § 1395 et seq.]), taxes, installment payments, etc.;

(2) Medical, hospitalization, and other similar expenses;

(3) Expenses for the support of others for whom the individual is legally responsible; and

would be "against equity and good conscience."[4] Pursuant to these statutory directives, the Secretary has promulgated regulations providing for a four-step process of administrative review: an initial determination that there has been an overpayment and that there is no basis for waiver of recovery (20 C.F.R. § 404.-905); a reconsideration of that initial determination upon request by the recipient (*Id.* § 404.914); an administrative hearing *de novo* before an administrative law judge (*Id.* § 404.917); and review by the Appeals Council of the Social Security Administration (*Id.* § 404.945). Judicial review is then available, under section 205(g) of the Act, 42 U.S.C. § 405(g), to claimants who have exhausted their administrative remedies.

While a claimant thus has a right to a full evidentiary hearing at the third step in the administrative process, such a hearing is not available until *after* the recoupment process has begun. When a claimant is notified of the initial adverse determination and of his right to seek reconsideration, he is given thirty days in which to submit, in writing, his reasons why he disagrees with the determination that he has been overpaid or why he seeks a "waiver" under section 204(b) of the Act. Once such a request for reconsideration or waiver has been filed, even if the thirty days has expired, the recoupment procedure is automatically deferred until such reconsideration is completed.[5] If the Secretary adheres to his initial determination, the claimant is so notified and benefits begin to be withheld. At that time, the claimant is notified of his right to seek an administrative hearing *de novo*, with the right to present oral testimony and to cross-examine witnesses. A request for an oral hearing, unlike a request for reconsideration, will not toll recoupment. While the record is not entirely clear, it appears that there is usually a delay of several months from the time benefits are first withheld to the time a claimant is able to obtain an oral hearing.

## II. THE FACTS

At the time this suit was filed, plaintiff Arlene Mattern was fifty-three years old and physically disabled. In 1971, she applied for disabled widow's benefits pursuant to 42 U.S.C. § 402(e)(1)(B)(ii), on the social security earnings record of her deceased husband. Her application was approved, and she became eligible for benefits as of May 18, 1971, with a monthly entitlement of $119.30. Because of a mandatory waiting period of six months,[6] plaintiff was not scheduled to begin receiving payments until December 1971. However, when plaintiff informed the social security office that she was in financial distress, she was issued, in February 1972, a check totalling $1063.80, which covered the period from May to December 1971. This payment was improper, since it had been issued in disregard of the mandatory six-month waiting period.

(4) Other miscellaneous expenses which may reasonably be considered as part of the individual's standard of living.

(b) When adjustment or recovery will defeat the purpose of title II [42 U.S.C. § 401 et seq.]. Adjustment or recovery will defeat the purpose of title II [42 U.S.C. § 401 et seq.] in (but is not limited to) situations where the person from whom recovery is sought needs substantially all of his current income (including social security monthly benefits) to meet current ordinary and necessary living expenses."

4. "Against equity and good conscience" is defined in 20 C.F.R. § 404.509, which provides:

"Against equity and good conscience" means that adjustment or recovery of an incorrect payment (under title II or title XVII [42 U.S.C. § 401 et seq. or § 1395 et seq.]) will be considered inequitable if an individual, because of a notice that such payment would be made or by reason of the incorrect payment, relinquished a valuable right (examples (1), (2), and (5)) or changed his position for the worse (examples (3), and (4)). In reaching such a determination, the individual's financial circumstances are irrelevant.

5. Social Security Claims Manual, § 5503(c).

6. The Act has since been amended to provide for a five-month waiting period. 42 U.S.C. § 423(c)(2) (1970).

Plaintiff was advised of the forthcoming special check in a letter of January 28, 1972. That letter also informed her that there was a possibility of duplication of payment and that if she should receive more than one check, she should return one of them to the social security district office. Prior to the receipt of either the special check or the January 28 letter, plaintiff had received her first monthly payment of $119.30. According to records maintained by the district office, plaintiff's sister called the office on January 26, 1972, and was told that the $119.30 check was correct but that the impending special check of $1063.80 had been erroneously issued. The records also indicate that, on January 28, a district office representative phoned plaintiff to tell her that the special check being mailed was incorrect and should be returned. Plaintiff never returned the check, and denies that she ever received a phone call instructing her to return it.

Several months later, on July 14, 1972, plaintiff was sent a letter advising her that she had received $1063.80 more in social security benefits than she was entitled to and that since she had failed to return the check an adjustment would be made in her forthcoming benefit payments. Plaintiff was also informed of the "reconsideration" and "waiver" provisions of the law. On August 7, 1972, plaintiff requested the Secretary to waive recoupment of overpayment by filing both a "refund" and a "without fault" questionnaire, in which she listed her monthly expenses and stated that she had no other source of income, that she had been ill, that she had spent the

check on her bills and that she had never received any letter or phone call advising her that the $1063.80 check had been sent in error. The district office rejected her request for waiver, on the ground that she was not without fault in causing the overpayment. In making this initial determination, the district office relied on its letter of January 28, advising plaintiff that if she received more than one check, she should return one of them. It also relied on its records indicating that plaintiff had been notified by phone on January 28 that the $1063.80 check was incorrect and should be returned.

Plaintiff subsequently filed a request for reconsideration and, in accordance with the Secretary's procedures, recoupment was deferred until completion of the reconsideration. On January 3, 1973, the district office reaffirmed its initial decision, and determined that her payments would be reduced by $30 per month until the full amount of the overpayment was recovered. In the meantime, plaintiff had filed this class action in the Eastern District of Pennsylvania. As a result of a stipulation between the parties, the plaintiff has continued to receive her full benefits until final disposition of her suit. The district court declared the recoupment procedure unconstitutional, and the Secretary appeals.[7]

## III. JURISDICTION

Plaintiff asserted several bases of jurisdiction in her complaint,[8] but the district court found that only one of them was appropriate—the Mandamus Act, 28 U.S.C. § 1361 (1970).[9] Since we agree

7. It appears from the record that the Secretary appealed from the wrong order. The notice of appeal indicates that he was appealing from the district court's order of April 30, 1974, which granted plaintiff's motions for a class action determination and for summary judgment, rather than from the final order of June 10, 1974, which granted injunctive relief. However, we believe that this defect is not fatal and that we can treat the appeal as having been taken from the underlying judgment. We believe that it is reasonable to infer that the intent of the Secretary was to appeal from the final judgment, and at oral argument counsel for plaintiff denied that his client had been prejudiced in any way. See Peabody Coal Co. v. Local Union Nos. 1734, 1508 and 1548, U.M.W., 484 F.2d 78, 81–82 (6th Cir., 1973); Lumberman's Mutual Ins. Co. v. Massachusetts Bonding & Ins. Co., 310 F.2d 627, 629 (4th Cir., 1962). Cf. Hodge v. Hodge, 507 F.2d 87, 89 (3d Cir., 1975).

8. 28 U.S.C. §§ 1331(a), 1343(4), 1346 and 1361 (1970).

9. This Act provides:

The district courts shall have original jurisdiction of any action in the nature of man-

that jurisdiction is available under the Mandamus Act, we need not consider the other jurisdictional rulings made by the district court.

■ It is well established that, in order for jurisdiction to lie in mandamus, a plaintiff must allege that the defendant owes him a clear, ministerial and non-discretionary duty. As we said in *Richardson v. United States*, 465 F.2d 844, 849 (3d Cir., 1972), *rev'd on other grounds*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974):

> In order for mandamus to issue, a plaintiff must allege that an officer of the Government owes him a legal duty which is a specific, plain ministerial act "devoid of the exercise of judgment or discretion" [citations omitted]. An act is ministerial only when its performance is positively commanded and so plainly prescribed as to be free from doubt.

The Secretary challenges the district court's holding that it had jurisdiction in mandamus on the ground that the duty which plaintiff seeks to compel is not a "ministerial act" which is "so plainly prescribed as to be free from doubt." After noting that the district court relied on *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), in holding that due process mandated a pre-recoupment oral hearing, and after distinguishing *Goldberg* on the *merits*, the Secretary concludes that "the broad and indeterminate scope of the due process

clause, as applied to the novel circumstances involved here, in no way discloses a plain and indisputable obligation that the Administration afford the hearings which the plaintiff has sought." (Br. at 34).

■ We believe that the Secretary's position is in error. Its chief deficiency is that in effect it confuses the issue of jurisdiction under the Mandamus Act with the process of resolving the merits of plaintiff's claim. We fully recognize that this case presents complex constitutional issues [10] which have not yet been definitively settled, and we agree that *Goldberg v. Kelly* is not plainly controlling. The complexity and novelty of the issues *on the merits,* however, do not necessarily deprive the federal courts of mandamus jurisdiction. A determination with respect to jurisdiction involves a threshold inquiry into whether the plaintiff has alleged a cause of action under the particular jurisdictional statute. Here, plaintiff alleges that the due process clause imposes an obligation on the Secretary to provide her with an oral hearing before adjusting her benefits. Thus, the duty alleged involves no element of discretion or room for judgment on the part of the Secretary,[11] and if we agree with plaintiff's contention on the merits, the result will be to place the Secretary under a binding, non-discretionary duty to provide a pre-recoupment oral hearing. Furthermore, the fact that the existence of the duty may

---

damus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

**10.** We also agree with the district court that the Mandamus Act encompasses constitutional obligations as well as statutory duties. *See Burnett v. Tolson,* 474 F.2d 877 (4th Cir., 1973); *Mead v. Parker,* 464 F.2d 1108 (9th Cir., 1972). In *Richardson, supra,* we held that mandamus was available to enforce a constitutional duty allegedly arising under the "Statement and Account" clause of the Constitution, Art. I, § 9, cl. 7, even though Congress had enacted a law expressly exempting the Central Intelligence Agency from the requirement to publish a statement and account of its receipts and expenditures. We also observed in *Rich-*

*ardson* that "mandamus should be construed liberally in cases charging a violation of a constitutional right." *Richardson, supra* 465 F.2d at 851.

**11.** This case is therefore distinguishable from *Jarrett v. Resor,* 426 F.2d 213 (9th Cir., 1970), on which the Secretary relies. *Jarrett* held that mandamus does not lie to compel the Army to grant a soldier a discharge as a conscientious objector. That case thus involved an exercise of judgment as to whether that particular plaintiff had met the legal criteria for being a conscientious objector and would largely involve an evaluation of the sincerity of the claimant's beliefs. By contrast, the plaintiff here is not challenging an exercise of judgment, but is alleging a failure to comply with the mandates of the due process clause.

become absolutely clear only after an interpretation of the due process clause and a consideration of the merits of the case does not deprive us of mandamus jurisdiction. *See Roberts v. United States,* 176 U.S. 221, 229–31, 20 S.Ct. 376, 44 L.Ed. 443 (1899); *Chaudoin v. Atkinson,* 494 F.2d 1323, 1330 (3d Cir., 1974); *Carey v. Local Board No. 2, Hartford, Connecticut,* 297 F.Supp. 252, 255 (D.Conn.), *aff'd per curiam,* 412 F.2d 71 (2d Cir., 1969).[12] Acceptance of the Secretary's reasoning would lead to an oddly circular result—if mandamus jurisdiction were unavailable because, prior to ruling on the merits, the Secretary's duty is not clear, then a court would never have jurisdiction to determine *whether* his duty was clear in the first place.[13]

■ Furthermore, we note that this is not a case where a plaintiff seeks to impose a wholly novel obligation on Government officials through the device of mandamus. While *Goldberg v. Kelly* may not be plainly controlling on the merits, it is a landmark precedent which imposes, under certain circumstances, a constitutional obligation on administrators of social welfare programs to provide oral hearings, and thus it is at least arguably controlling in this case. Our task here is essentially to determine whether the same constitutional duty imposed by *Goldberg* in welfare termination cases is also applicable to social security cases involving recoupment of

overpayments. Under these circumstances, we agree with the district court that the applicability of *Goldberg* is sufficiently apparent, in determining the threshold issue of mandamus jurisdiction, for us to say that plaintiff has alleged a clear duty on the part of the Secretary. We therefore believe that, since plaintiff here has relied on a closely analogous Supreme Court decision in alleging a clear constitutional duty owed her by the defendant, and since acceptance of her legal theory on the merits would establish such a clear duty, then jurisdiction to consider the merits exists under the Mandamus Act.

## IV. THE CLASS ACTION

■ The Secretary raises two separate arguments challenging the propriety of the district court's order certifying the action as a class action. First, he contends that the district court erred in failing to provide notice to all the members of the class. Unlike the recent Supreme Court decision in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), this action was not maintained under Rule 23(b)(3) of the Federal Rules of Civil Procedure, but rather under Rule 23(b)(2). Thus, the mandatory notice provision of Rule 23(c)(2) does not apply. The Secretary, however, contends that some form of notice to all class members is constitutionally required, relying on *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir., 1968).

**12.** *See also Schlagenhauf v. Holder,* 379 U.S. 104, 110, 85 S.Ct. 234, 13 L.Ed.2d 152 (1969), where the Supreme Court indicated that mandamus was appropriate to settle novel and important problems; and *Garfield v. Goldsby,* 211 U.S. 249, 29 S.Ct. 62, 53 L.Ed. 168 (1908), where the Supreme Court held that mandamus was available to compel the Secretary of the Interior to restore plaintiff Indian to the rolls, because the Secretary, in the absence of statutory authority and in violation of due process of law, had stricken plaintiff's name from the rolls without providing notice and an opportunity to be heard.

**13.** While the Secretary purports to disclaim advocating a "plain meaning" rule for purposes of determining mandamus jurisdiction (Brief at 34–35 n. 25), we believe that that is

essentially what he does advocate, since he proceeds to contend that *Goldberg v. Kelly* is distinguishable, that the case law fails to establish an indisputable duty to provide pre-recoupment hearings, and that the result of an inquiry into the extent of the Secretary's obligations (apparently through examining legal precedents) "still leaves the issue in doubt." While we acknowledge that there is no binding precedent directly on point, we believe for the reasons already stated that that fact does not deprive us of mandamus jurisdiction. Jurisdiction depends on whether a plaintiff has *alleged* a cause of action, and if we rule in plaintiff's favor on the merits, the result of our inquiry will be to remove any doubt as to the Secretary's constitutional obligations in recoupment cases.

Recently, however, this Circuit has declined to follow the Second Circuit view and has held that notice to the absent class members is not constitutionally required in an action maintained under Rule 23(b)(2). *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 254–57 (3d Cir., 1975). We adhere to that view [14]

The Secretary's second contention is that the class order was overbroad.[15] The Secretary bases this contention on a distinction he draws between two subclasses of recoupment cases. The first he terms "reconsideration" cases, in which a claimant merely denies that he in fact received an overpayment or disputes the amount he was allegedly overpaid. The second he terms "waiver" cases, in which the claimant concedes that he received an overpayment but seeks to rely on the provisions of section 204(b) of the Act,[16] *i. e.,* he contends that he was not at fault and that the recoupment would frustrate the purposes of the Act or would be against equity and good conscience. The Secretary further asserts that the plaintiff was only seeking to "waive" recoupment and thus could not represent individuals seeking "reconsideration." He therefore contends that, to the extent that the class encompassed "reconsideration" cases as well as "waiver" cases, it was overbroad.

As we discuss in greater detail *infra,* we agree that "reconsideration" and "waiver" cases present somewhat different legal issues, and thus we conclude that the final judgment must be modified to take these differences into account. However, we believe that a distinction must be made between requiring entry of a new judgment after ruling on the merits, which would have the incidental effect of limiting the class,

and directly modifying the scope of the class prior to a ruling on the merits, which the Secretary appears to ask us to do. While this may seem at first glance to be a distinction without a difference, we believe that there would be a significant difference in this case. If we accept the Secretary's contentions that the class order was overbroad to the extent that it included "reconsideration" cases and that we should limit the class to "waiver" cases (on the ground that plaintiff sought only "waiver" of recoupment), then we could not even consider the constitutionality of the Secretary's recoupment procedure in "reconsideration" cases. *Cf. Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir., 1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). If, however, we accept the class as defined by the trial judge, then we must consider the constitutionality of recoupment in both "waiver" and "reconsideration" cases, drawing whatever distinction we think is appropriate in terms of the relief granted.

■ We conclude, however, that under established legal principles, we must accept the district court's definition of the class, and that we must therefore consider the constitutionality of all types of recoupment cases. While the Secretary argues basically that there were two distinct subclasses in recoupment cases and that plaintiff was a member of only one of them, the district court defined the class to include recipients in essentially all cases where benefits were recouped without a prior oral hearing.[17] Since such an order concerned the size of the class and since the Secretary made no motion in the district court, based on Fed.R.Civ.P. 23(a), to limit the class to "waiver" plaintiffs, the order was within

---

**14.** We also note that the Second Circuit recently indicated that it did not intend to require notice in class actions brought under Rule 23(b)(2). *Frost v. Weinberger,* 515 F.2d 57 (2nd Cir., 1975).

**15.** The initial class order, issued on April 30, 1974, defined the class as "consisting of all persons eligible for Social Security OASDI benefits within the counties encompassed by

the Eastern District of Pennsylvania, whose benefits may be terminated, reduced or otherwise adjusted in order to recoup an over-payment." Subsequently, in its order of June 10, 1974, granting final injunctive relief, the district court further limited the class in a manner not relevant to this appeal.

**16.** *See* note 1, *supra.*

**17.** *See* note 14, *supra.*

the discretion of the district court and thus its decision should be affirmed. *Wetzel, supra* 508 F.2d at 253; *Brown v. United States,* 508 F.2d 618, 627 (3d Cir., 1974); *Carey v. Greyhound Bus Co.,* 500 F.2d 1372, 1380 (5th Cir., 1974).

For the foregoing reasons, we believe that the district court did not err in concluding that the class included all recoupment cases rather than merely "waiver" cases. While "waiver" and "reconsideration" cases require somewhat differing legal analysis, as we note *infra,* they are not so different that the district court committed reversible error in treating the class as a single large class encompassing all recoupment cases. Furthermore, as indicated above it does not appear that the Secretary, in his motion in opposition to plaintiff's motion for a class action in the district court, raised the contention that the class order, if granted, should be limited solely to "waiver" cases. Under these circumstances, we cannot conclude that the district court erred in defining the class as broadly as it did.[18]

## V. THE MERITS[19]

### A.

■ The chief precedent upon which plaintiff relies is *Goldberg v. Kelly, supra.* In that case, the Supreme Court held that due process requires that welfare officials provide notice and an oral hearing prior to any termination of benefits. The Court relied heavily on the welfare recipients' "brutal need" for continued payments. A "crucial factor," in its view, was that "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." Adopting a balancing test, the Court concluded that "the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in fiscal and administrative burdens." *Goldberg, supra,* 397 U.S. at 266, 90 S.Ct. at 1019.

The Secretary, however, contends that *Goldberg* is distinguishable and that it must be read in the light of subsequent decisions which have further refined the requirements of due process. The Secretary's first argument is that, except in most unusual circumstances as evidenced by *Goldberg v. Kelly,* the Supreme Court has not required oral evidentiary hearings prior to a deprivation of a property interest where the preliminary pre-deprivation proceedings are sufficient to establish the "probable validity" of the administrative claim. Pointing to its procedures providing for an initial determination and a reconsideration, coupled with the right to submit written responses and documentary proof, the Secretary contends that the pre-recoupment procedure followed by the Social Security Administration is sufficient to establish the "probable validity" of a decision to recoup, and that a *post*-recoupment oral hearing therefore satisfies due process. We see several basic problems with this analysis, however.

---

18. Thus, we need not decide whether, on the facts of this case, plaintiff sought only "waiver" of recoupment.

19. In addition to holding that due process required an oral hearing prior to the recoupment of benefits, the district court concluded that *ex parte,* summary decisions on recoupment are contrary to the "purpose" of the Social Security Act. This conclusion as to the Act's "purpose" was dictum, however, since the district court stated that mandamus jurisdiction would require a showing that the Secretary was under a clear, non-discretionary duty, which in turn depended upon an analysis of the due process issue. 377 F.Supp. at 916–17. We agree that mandamus jurisdiction cannot rest on something as nebulous as an act's "purpose," at least where the act, as here, does not by its terms require a hearing. In any event, we question whether the mere fact that the "purpose" of the Act may be "compassionate" can be any basis for concluding that its purpose can be furthered only by requiring *oral* pre-recoupment hearings. *But cf. California Dept. of Human Resources Development v. Java,* 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971).

First, the Secretary relies primarily on a line of cases which, while having some relevance on the issue, did not purport to overrule or modify *Goldberg* and are not controlling here. *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Of these three decisions, only *Mitchell* indicated that "probable validity" may be determined in the absence of a prior oral hearing; *Fuentes* and *Sniadach,* in fact, required prior oral hearings. Thus, *Mitchell,* rather than *Goldberg,* represents the exception to the rule. Also, those three cases, unlike *Goldberg,* involved creditors' *ex parte* seizure of property belonging to debtors,[20] and thus present somewhat different legal considerations than state termination or reduction of benefits under social welfare programs. At no point did the Court in *Mitchell* indicate that *ex parte* proceedings to determine "probable validity" were permissible outside of the creditor/debtor context. In *Goldberg,* the Supreme Court considered a state welfare procedure in which a claimant had a right, after being interviewed by his caseworker and prior to termination of benefits, to receive a written explanation of the reasons for termination and to submit written information in rebuttal. He also had a right

to a full oral hearing *after* termination. 397 U.S. at 258–60, 90 S.Ct. 1011. The Court, however, held that this procedure was insufficient and required an oral hearing prior to termination. Since the procedure invalidated in *Goldberg* would seem to be at least as effective in ensuring "probable validity" as the procedure used here,[21] and since the Court in *Mitchell* did not purport to modify *Goldberg,* we refuse to extend the reasoning of *Mitchell* outside the creditor/debtor context and to permit *ex parte* determination of "probable validity" in social welfare cases.

Furthermore, even if *Mitchell's* "probable validity" analysis were applicable to social welfare cases, the procedure here may not pass muster. The Supreme Court summarized this approach in *Mitchell, supra,* 416 U.S. at 611, 94 S.Ct. at 1902, by stating that *Sniadach* and *Fuentes*

merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and *immediate* post-termination hearing is provided. (Emphasis added.)

The Court upheld the Louisiana sequestration statute challenged in *Mitchell* partly because it provided for an immediate hearing after the writ issued. *Id.*

**20.** The Secretary also cites Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), but that case is not on point, since the Court there, as in *Fuentes* and *Sniadach,* held that some kind of hearing was required before the revocation of a driver's license. While it said that the purpose of the hearing was only to determine the "reasonable possibility" of the driver's wrongful conduct, and while it left the scope of such a hearing undefined, it still required an *oral* hearing prior to revocation. See footnote 31 *infra.*

The Secretary also cites Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), but that case contained five separate opinions, none of which represented a majority view. Only three Justices (Powell, Blackmun and White) indicated that an *ex parte* determination of "probable validity" might satisfy due process in the context of employee

discharges. The plurality opinion held that there was no due process right to a hearing prior to discharge, because the "property interest" involved, unlike those in *Goldberg, Bell* and *Sniadach,* "was itself conditioned by the procedural limitations which had accompanied the grant of that interest." *Id.* at 155, 94 S.Ct. at 1645. Consequently, the plurality held that there was no claim of entitlement to the job. However, a majority of the Court rejected the plurality's view. *Id.* at 166–67, 94 S.Ct. 1633 (Powell, J., concurring), and 211, 94 S.Ct. 1633 (Marshall, J., dissenting).

**21.** Both procedures permit written submissions and documentary proof, but the procedure here, unlike the one invalidated in *Goldberg,* does not require a Government official to discuss the case with the beneficiary in person prior to a decision to recoup. *See* 397 U.S. at 258, 90 S.Ct. 1011.

at 618, 94 S.Ct. 1895.[22] Thus, the constitutionality of a procedure establishing "probable validity" without a full oral hearing prior to the property deprivation may depend in part on whether there is an immediate right to an oral hearing afterward.[23] As we noted previously, however, there seems to be a delay of several months from the time recoupment has begun to the time a recipient is provided a hearing. _____ ..

Finally, if the Secretary's pre-recoupment procedures are to be upheld on the ground that they are sufficient to determine "probable validity," they would have to be effective in minimizing the risk of an erroneous determination. *See Mitchell, supra* at 618, 94 S.Ct. 1895; *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633 (1974), at 170, 94 S.Ct. 1633 (Powell, J., concurring) and 188, 94 S.Ct. 1633 (White, J., concurring in part and dissenting in part). However, the Secretary's own figures undercut his contention that the procedures at issue here are effective to minimize erroneous decisions to recoup.[24] In 1970, the only year from which figures have been made available to us, over one-third of all persons seeking a post-recoupment hearing (560 out of 1600) obtained reversals.[25]

■ Therefore, because of a combination of factors—the fact that the Supreme Court has given no indication that *Mitchell's ex parte* "probable validity" approach is applicable outside the creditor/debtor context, and that such an approach appears to have been at least implicitly rejected in *Goldberg v. Kelly*; the substantial delay between the initiation of recoupment and an oral hearing; and the significant reversal rate following post-recoupment hearings—we conclude that the pre-recoupment procedures cannot be defended on the ground that they are sufficient to establish the "probable validity" of the determination in question.

The Secretary also seeks to distinguish *Goldberg* by arguing that the impact of a termination of welfare benefits is more severe than a recoupment of a social security overpayment, since welfare recipients, unlike social security beneficiaries, are by definition destitute and since a beneficiary, whose payments have merely been reduced, is still obtaining some assistance. *Goldberg,* as noted previously, rested in large part on welfare recipients' "brutal need" for continued payments, noting that "[t]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss." *Goldberg, supra,* 397 U.S. at 262–63, 90 S.Ct. at 1017, quoting *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The Secretary also relies on *Torres v. New York State Dept. of Labor,* 321 F.Supp. 432 (S.D.N.Y.1971), *vacated and remanded,* 402 U.S. 968, 91 S.Ct. 1685, 29 L.Ed.2d 133 (1971), *adhered to,* 333 F.Supp. 341 (S.D.N.Y.1971), *affirmed,* 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972), in

---

**22.** The Court in *Mitchell,* noted that the Florida statute invalidated in *Fuentes* provided the buyer with a right to a hearing only "eventually," and that under the Pennsylvania statute invalidated in the same case, a buyer may never get a hearing. *Mitchell, supra* at 615–16, 94 S.Ct. 1895.

**23.** Similarly, the recent Supreme Court decision in North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), distinguished *Mitchell* in part because the Georgia garnishment statute, unlike the Louisiana sequestration statute upheld in *Mitchell,* did not provide for an immediate hearing. *Id.* at 4194. See also Fusari v. Steinberg, 419 U.S. 379, 386, 95 S.Ct. 533, 42

L.Ed.2d 521 (1975), where the Supreme Court indicated that the length of the period of deprivation of benefits and the rapidity of administrative review were important factors bearing on the constitutionality of termination procedures.

**24.** We also note that pre-recoupment procedures lack some of the institutional safeguards that the Court in *Mitchell* indicated were important, such as the requirements that the party seeking the writ file an affidavit setting forth specific facts and that the pre-deprivation decision be made by a neutral magistrate.

**25.** The Secretary's figures, however, make no distinction between "reconsideration" and "waiver" cases.

which the Supreme Court affirmed without opinion a three-judge district court decision, which had held that a state may deny a claim for unemployment insurance without a prior oral hearing since the denial of unemployment compensation does not necessarily result in severe economic harm to the claimant.[26]

Since *Goldberg* and *Torres*, however, the Supreme Court has indicated, though not with complete consistency, that the requirements of due process do not depend on the severity of the impact resulting from the deprivation. In *Fuentes, supra* at 88–89, 92 S.Ct. at 1998, the Court rejected the contention that *Goldberg* carved out a rule of "necessity," and stated that that decision was "in the mainstream of past cases, having little or nothing to do with absolute 'necessities' of life but establishing that due process requires an opportunity for a hearing before a deprivation of property takes effect." The Court in *Fuentes* relied in part on *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), which had held that there must be an opportunity for a hearing on the issue of fault before "mere" suspension of a driver's license. The Court in *Fuentes* observed that drivers' licenses were not "necessities" like welfare or wages, but were nevertheless sufficiently important to be entitled to protection under due process. More recently, in *Mitchell, supra*, 416 U.S. at 610, 94 S.Ct. 1895, the Supreme Court seemed to retract somewhat by indicating that one of the factors to take into account, in deciding whether a prior hearing was required, was the impact of the deprivation.

In its most recent pronouncements, however, the Supreme Court has indicated that severity of impact is not a prerequisite. In *North Georgia Finish-*

*ing, supra,* the Court reaffirmed much of the *Fuentes* analysis (419 U.S. at 605, 95 S.Ct. 719), and held that commercial establishments have the same due process rights as consumers (419 U.S. at 606, 95 S.Ct. 719). Furthermore, in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court held that due process requires an oral hearing prior to disciplinary suspensions from school. In rejecting the school board's argument that a prior hearing was not required because students suspended for ten days did not suffer "grievous loss," the Court stated:

> Appellee's argument is again refuted by our prior decisions; for in determining "whether due process requirements apply in the first place, we must not look to the 'weight' but to the *nature* of the interest at stake." *Board of Regents v. Roth, supra,* [408 U.S.] at 570–71 [92 S.Ct. 2701, at 2705–2706, 33 L.Ed.2d 548]. Appellees were excluded from school only temporarily, it is true, but the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, "is not decisive of the basic right" to a hearing of some kind. *Fuentes v. Shevin,* 407 U.S. 67, 86 [92 S.Ct. 1983, 1997, 32 L.Ed.2d 556] (1972). The Court's view has been that as long as a property deprivation is not *de minimis,* its gravity is irrelevant to the question whether account must be taken of the Due Process Clause. *Goss, supra* at 575, 95 S.Ct. at 737.

█ We therefore believe that we are constrained by Supreme Court's most recent pronouncements not to base our decision on our perception of the severity of the impact of recoupment on social security recipients, provided we deter-

**26.** Plaintiff seeks to discount the precedential effect of *Torres* by pointing to language in *Fusari, supra,* indicating that a summary affirmance affirms only the result and not the reasoning of the lower court. However, since we see no way in which *Torres* and *Goldberg* are distinguishable on the due process issue other than by comparing the severity of the impact, we believe that the Supreme Court's summary affirmance should be construed as an acceptance of this distinction, at least to the extent that *Torres* is given any precedential weight. *Compare* Doe v. Hodgson, 478 F.2d 537, 539 (2d Cir. 1973), *with* Edelman v. Jordan, 415 U.S. 651, 670–71, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and Dillenburg v. Kramer, 469 F.2d 1222, 1225 (9th Cir. 1972).

mine that the impact is not *de minimis*. The impact in this case is surely more than *de minimis,* since we believe that Congress, in enacting a program providing disabled widows' benefits, recognized that recipients like Mrs. Mattern were in need of assistance. We also note that the facts of this case indicate that Mrs. Mattern was both disabled and without any other source of income.[27]

We are aware of the recent Second Circuit decision, *Frost v. Weinberger,* 515 F.2d 57 (2d Cir. 1975), but decline to follow it. First, we note that that decision is distinguishable in several respects. At issue in *Frost* was whether a hearing was required before a reduction in benefits to surviving legitimate children. Such a reduction was required because of the competing claims of illegitimate children of the wage earner and because of the statutory ceiling on total payments allowable. 42 U.S.C. § 403(a) (1970). Thus, as the court in *Frost* noted, the controversy was not so much one between the Government and beneficiaries as between two groups of beneficiaries, with the Social Security Administration having "no financial stake" and being "totally disinterested as between the two sets of claimants." Unlike *Goldberg,* therefore, where the only interest conflicting with that of the plaintiffs was the Governmental interest in protecting its resources, in *Frost* there were

"important private interests as well," *i.e.,* the interest of the illegitimate children to promptly receive payments to which they were entitled. Such a competing private interest, of course, is not present here. Furthermore, the court in *Frost* noted that the type of hearing that would be required would place unusual burdens on the Social Security Administration because of the possibility that legitimate and illegitimate children, all of whom would have to be present or represented at a hearing, might be living in different areas. The court further noted that "a paternity hearing may demand an inquiry into the habits of a father long before married or long after his departure from the matrimonial household." These factors convinced the court in *Frost* that a paternity hearing would be less prompt and more protracted than the brief hearings likely to arise in welfare-termination cases, and thus the court concluded that those factors cut "in favor of allowing the SSA to act preliminarily on the basis of something less than a full-scale hearing." Those factors are not present here, and we believe that the hearings are likely to be as simple as those in welfare termination cases.

We also note that the court in *Frost* relied heavily on the analysis that a prior oral hearing was required only in cases where the deprivation was severe.[28] As

---

27. The "Refund Questionnaire" which plaintiff filled out stated that she had no other source of income besides her monthly disability check (54a). We observe, however, the Refund Questionnaire was dated August 7, 1972, and there is the possibility that plaintiff could have applied for, and received, welfare payments since that date.

28. We note this language in the *Frost* case:
    The Court's decisions can be fairly summarized as holding that the required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it.
    . . . An element crucial to *Goldberg* was that the benefits at issue were awarded

on the basis of need and represented the last source of income available to the families. The benefits here at issue are not based upon need; . . . . [pp. 66–67 of 515 F.2d]

. . . [I]n cases where a reduction in such benefits would place a family below the subsistence level, other forms of government assistance would become available, however, unattractive resort to them may be. The weights in favor of departing from the ordinary principle that something less than a full-scale evidentiary hearing suffices *before* administrative action, when a full hearing is provided promptly thereafter, are thus substantially less than in *Goldberg.* [p. 67 of 515 F.2d]

we stated earlier, however, we do not read the post-*Goldberg* decisions as making due process requirements turn on the severity of the impact. The opinion in *Frost* nowhere mentioned the Supreme Court decisions in *Bell v. Burson, Fuentes v. Shevin, North Georgia Finishing* or *Goss v. Lopez,* which we read as requiring prior hearings wherever the impact is more than *de minimis.* The court in *Frost* relied heavily on *Arnett v. Kennedy, supra,* but as we observed previously (*see* note 19 *supra* ), that decision presented five separate opinions, each offering different rationales and none representing a majority view. Only three of the Justices (Powell, Blackmun and White) indicated that the right to a hearing would turn, at least in part,[29] on the severity of the impact. 416 U.S. at 169, 94 S.Ct. 1633 (Powell, J., concurring) and 201–02, 94 S.Ct. 1633 (White, J., concurring in part and dissenting in part). Given the fact that a majority of the Court in *Arnett* did not employ the rational adopted in *Frost,* we continue to adhere to our reading of *Bell, Fuentes, North Georgia Finishing* and *Goss v. Lopez.* We also note that two other Circuits have concluded that due process requires a hearing in cases involving termination of social security payments. *Eldridge v. Weinberger,* 493 F.2d 1230 (4th Cir. 1974), *aff'g* 361 F.Supp. 520 (W.D.Va.1973), *cert. granted,* 419 U.S. 1104, 95 S.Ct. 773, 42 L.Ed.2d 800 (1975); *Williams v. Weinberger,* 494 F.2d 1230 (5th Cir. 1974), *aff'g* 360 F.Supp. 1349 (N.D.Ga.1973).

### B.

Another contention raised by the Secretary is more convincing. This argument is that recoupment cases present issues which are well adapted to resolution by written submissions and documentary proof. Consequently, he argues, an oral hearing would be superfluous and should not be constitutionally required. As we will explain in greater detail below, the applicability of this argument to recoupment cases necessitates a discriminating analysis of the different types of cases and of the different types of factual disputes likely to arise. However, we do accept the Secretary's basic premise that due process should not require a pre-recoupment oral hearing where factual disputes are as well suited to resolution by documentary proof and written submissions as by oral hearings.

Implicit in *Goldberg v. Kelly* is the recognition of the fact that issues likely to arise in welfare termination cases can only be resolved through an oral hearing. One of the plaintiffs was a woman

---

29. We note that in *Arnett,* the separate opinions of Justices Powell (with whom Justice Blackmun joined) and White did not rely solely on the fact that they perceived the impact on a discharged Government worker to be less severe than that on a welfare recipient whose benefits have been terminated. Justice Powell also relied on the potential disruption to Government efficiency and morale if the Government were required to retain a disruptive or otherwise unsatisfactory employee pending a hearing, 416 U.S. at 168, 94 S.Ct. 1633, a factor which, of course, is not present in this case. Justice White likewise placed several factors in the balance, 416 U.S. at 190, 94 S.Ct. 1633. One of them was the risk that the initial deprivation may be wrongful. In fact, this was essentially the reason he dissented in part. (The fatal defect, in his view, was the lack of an impartial hearing examiner). As we noted earlier, the significant reversal rate in recoupment cases after a hearing is empirical evidence that there is indeed a serious risk that the initial deprivation may be wrongful. Also, if the Government must continue to pay a worker pending a hearing, those payments cannot be recovered even if the Government should prevail. 416 U.S. at 193, 94 S.Ct. 1633. Here, however, the Social Security Administration, if it prevails at the hearing, should be able to recoup the full amount of the overpayment (provided the claimant does not die before the completion of recoupment).

Finally, we believe that if *Arnett* is construed to have turned on the fact that a discharged Government employee did not suffer a sufficiently serious deprivation, that decision must necessarily have overruled Perry v. Sindermann, 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a result which none of the Justices in the *Arnett* majority purported to accomplish. A college professor who has a de facto claim to tenure and who is entitled to a hearing under *Perry* is no more reduced to a state of "brutal need" by the nonrenewal of his contract than is a discharged OEO civil servant.

whose benefits had been terminated because she allegedly failed to cooperate with welfare officials in suing her estranged husband. Another was a man whose benefits were terminated because he refused to accept drug counseling and rehabilitation, though he claimed that he did not in fact use drugs. *Goldberg, supra*, 397 U.S. at 256 n.2, 90 S.Ct. 1011. It is obvious that resolution of those factual disputes could only be made at an oral hearing, where the trier of fact could evaluate the credibility of the claimant. As the Court noted, "where credibility and veracity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision." *Id.* at 269, 90 S.Ct. at 1021.

Similarly, in *Goss v. Lopez, supra,* the question of whether a student had engaged in disruptive conduct justifying suspension could not possibly be determined without an oral hearing. See also *Bell v. Burson, supra,* which required an oral hearing to determine fault before revocation of a driver's license. By contrast, the Supreme Court in *Mitchell* held that no prior opportunity whatsoever need be given the debtor to oppose repossession of his property, in part because the issue "turns on the existence of the debt, the lien, and the delinquency," which "are ordinarily uncomplicated matters that lend themselves to documentary proof." *Id.* 416 U.S. at 609, 94 S.Ct. at 1901. Thus, "[t]he nature of the issues at stake minimize the risk" of an erroneous *ex parte* determination. *Id.* at 609–10, 94 S.Ct. at 1901. See also *Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165, 1169 (2d Cir., 1973), where the court stated that an oral hearing was not required prior to deciding whether to increase the rents of public housing tenants, since "the oppor-

tunity to present oral evidence is not particularly valuable where technical financial data is at issue."

Application of the above principle to recoupment cases is more complex. As noted previously, the Secretary draws a distinction between "reconsideration" and "waiver" cases, arguing that they present somewhat different legal issues. We agree with the Secretary that "reconsideration" cases are generally well suited to resolution by documentary proof, and that claimants in most cases of this type are not constitutionally entitled to a prior oral hearing.[30] Most of these disputes involve matters of a purely arithmetical nature—whether the computation of an earnings statement is correct; whether a computer's calculation of the amount of benefits received is accurate; whether two benefit checks have been received rather than one. In such circumstances, an examination of social security records and cancelled checks would seem to be sufficient, and it is hard to see how an oral hearing would be of much benefit to the claimant. Consequently, the Secretary's pre-recoupment procedures permitting written evidence and providing for an examination of written documents, when coupled with a right to a *post*-recoupment oral hearing, satisfy due process.

We add one *caveat,* however. Because we cannot envision all the situations in which "reconsideration" cases are likely to arise, we acknowledge the possibility that there may be cases where the opportunity to appear in person might be important in making an accurate determination. Thus, while many "reconsideration" cases can be decided without a prior oral hearing, we believe that, as a matter of due process, the Secretary should establish procedures which would provide for an oral hearing where a case

---

**30.** We decline to establish a flat rule that *all* "reconsideration" cases may be decided prior to recoupment without an oral hearing, since we do not have sufficient basis for knowing all the types of cases which the Secretary may classify as being of the "reconsideration" type. The crucial distinction is not whether the cases are labeled "reconsideration" or "waiv-

er," but whether they lend themselves to resolution by documentary proof. Thus, while we shall use those terms as suggested by the Secretary for purposes of convenience, we do not mean to imply that the constitutionality of recoupment in a particular case is dependent upon the label used nor that we necessarily accept the Secretary's categorizations *in toto.*

does not hinge on documentary evidence and where a claimant raises issues which necessitate an evaluation of his credibility. We are mindful of the concern expressed in *Goldberg* that many claimants lack the education or ability to frame written submissions in a persuasive light, and thus if a claimant in a "reconsideration" case *raises* such an issue, he should be entitled to a hearing.

If, however, a claimant merely denies receiving duplicate checks or claims that his earnings were of a certain amount, cancelled checks bearing his endorsement or earnings records maintained by the social security office would seem to constitute hard proof incapable of oral rebuttal. In this case, for example, if plaintiff had merely denied receiving the $1,063.80 check or had claimed that the check did not represent an overpayment, she would not have been constitutionally entitled to a hearing prior to recoupment. A cancelled check bearing her endorsement would be persuasive proof that she had received and cashed it, and the date of issue, coupled with the statutory six-month waiting period, would be persuasive proof that the check represented an overpayment. Furthermore, the plaintiff in this case, though given the opportunity to do so, came forth with no written evidence to support a contention that she had not in fact been paid $1,063.80 or that that check did not represent an overpayment. Consequently, if she had made solely those contentions, it is hard to see how a pre-recoupment oral hearing would be helpful. In all cases, however, a claimant should be informed, prior to initiation of recoupment, of the basis on which an adverse determination is made and should be offered the opportunity to explain or rebut any written evidence against her.

With respect to "waiver" cases, the Secretary admits that resolution of factual disputes is more complex than in "reconsideration" cases, but offers essentially two reasons why pre-recoupment oral hearings in such cases should not be constitutionally required. First, relying on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), he argues that a recipient has no "claim of entitlement" to an overpayment and thus the due process clause "does not require the Secretary—in deciding to make a gift of funds improperly received by the beneficiary—to also stay his hand pending a hearing" on the waiver request (Br. at 24). We reject this analysis. Section 204(b) of the Act [31] gives a recipient of an overpayment a statutory right not to have his payments reduced under certain enumerated circumstances (if he is without fault, etc.), and in "waiving" recoupment the Secretary is not merely making a "gift," but is complying with the statute.[32] Thus, the fact that plaintiff may not have been entitled to *receive* the overpayment does not mean that she has no claim of entitlement to *retain* it (or at least to receive a full amount of her future monthly payments).

The Secretary also contends that "waiver" cases, like "reconsideration" cases, lend themselves to resolution by documentary proof. We disagree. One of the factors to be considered in a "waiver" case is whether the claimant is "without fault," and the Supreme Court has clearly indicated that determinations as to fault must be made at an oral hearing.[33] The facts of this case graphically illustrate the need for an oral hearing. In determining that plaintiff was

---

**31.** *See* note 1 *supra.*

**32.** The statute does not make "waiver" discretionary, but rather uses mandatory language: *"there shall be no"* recoupment under the conditions specified.

**33.** *Cf. Mitchell, supra,* at 416 U.S. 617, 94 S.Ct. at 1905, where the Supreme Court in discussing and distinguishing *Fuentes,* said:

As in *Bell v. Burson,* where a driver's license was suspended without a prior hearing, when the suspension was premised on a fault standard, . . . in *Fuentes* this fault standard for replevin was thought ill-suited for preliminary *ex parte* determination.

not without fault, the Secretary relied on basically two factors—its records indicating that plaintiff had been informed of the overpayment by telephone, and its letter of January 28, 1972. Plaintiff denies that she received such a phone call, and we do not see how resolution of this factual dispute could possibly be made without allowing her to tell her story in person and enabling a trier of fact to evaluate her credibility. Similarly, a finding of fault could not rest on the ambiguous January 28 letter, at least without giving plaintiff an opportunity to explain in person what she thought it meant.[34] Another requirement that a claimant in a waiver case must meet is that recoupment would either frustrate the purposes of the Act or be against equity and good conscience. As defined by the Secretary's regulations, these terms refer to such matters as difficulty in meeting necessary living expenses or a change of position by the recipient.[35] We do not see how a resolution of such questions can reliably be determined in the absence of oral testimony.

While we believe that claimants in "waiver" cases have a constitutional right to a pre-recoupment oral hearing, that right may not attach in all cases. Where a claimant in a "waiver" case raises no disputed issue of fact, or where, accepting his version of the facts as true, we could say as a matter of law that he was not entitled to retain the overpayment, then again it is hard to see how a pre-recoupment hearing would be of benefit.[36] Thus, the constitutional requirement of a hearing may be limited to some extent by principles analogous to summary judgment in civil litigation.

See *Mills v. Richardson,* 464 F.2d 995, 1001 (2d Cir., 1972). For example, if plaintiff in this case had admitted receiving a telephone call telling her that the impending $1063.80 check was in error and that she should return it, and if she merely alleged hardship, then as a matter of law, she would not be without fault and the recoupment could proceed in advance of an oral hearing. The reason for this is that, under section 204(b) of the Act, a claimant seeking to waive recoupment must establish two things: that he is without fault *and* that the recoupment would defeat the purpose of the Act or be against equity and good conscience. Thus, if plaintiff's written response had conceded one of these two elements, she would have no legal right to retain the overpayment.[37]

### C.

In sum, we conclude that the recoupment procedure established by the Secretary is constitutionally deficient in that it does not provide for pre-recoupment oral hearings in the situations we have indicated are necessary. We do not believe that due process requires pre-recoupment oral hearings in all cases, but the Secretary's existing procedure makes no distinction between the various types of cases and issues that are likely to arise. To the extent that a hearing is required, we agree with the district court that the full panoply of procedural safeguards need not be provided and that the pre-recoupment hearing need not take the form of a judicial or quasi-judicial trial. In *Richardson v. Perales,* 402 U.S. 389, 399–401, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1971), the Court

---

**34.** That letter told her that a special check in the amount of $1063.80 was being mailed to her, and proceeded to say:

> We have taken steps to avoid duplication of payment. However, should you receive more than one check because of these dual actions, please return one of them to the social security district office immediately. (51a). We believe it is perfectly reasonable for plaintiff to have believed that this letter was referring to the possibility that she might receive *two* $1063.80 checks. Since she only

received one such check, we do not see how a finding of fault can be based on this letter.

**35.** *See* notes 3 and 4 *supra.*

**36.** The Supreme Court explicitly left open this issue in *Goldberg, supra* 397 U.S. at 268 n.15, 90 S.Ct. 1011.

**37.** Furthermore, like the district court, we conclude that a hearing is not required where the claimant has made a knowing, intelligent and voluntary waiver of the right.

has explained the informal nature of social security hearings in this language:

> The Social Security Act has been with us since 1935. Act of August 14, 1935, 49 Stat. 620. It affects nearly all of us. The system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend. But, as the Government's brief here accurately pronounces, 'Such a system must be fair—and it must work.'
>
> Congress has provided that the Secretary
>
> 'shall have full power and authority to make rules and regulations and to establish procedures . . . necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.' § 205(a), 42 U.S.C. § 405(a).
>
> .    .    .    .    .
>
> From this it is apparent that (a) the Congress granted the Secretary the power by regulation to establish hearing procedures; (b) strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent; and (c) the conduct of the hearing rests generally in the examiner's discretion. There

emerges an emphasis upon the informal rather than the formal. This, we think, is as it should be, for this administrative procedure, and these hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair.

We therefore believe that due process requires only an informal, oral hearing which provides the following safeguards: [38]

1) an impartial decision maker separated from those making the previous administrative determinations in the case; [39]

2) timely and adequate notice to the recipient of the reasons for recoupment;

3) an effective opportunity for the recipient to confront and cross-examine adverse witnesses;

4) an effective opportunity for the recipient to present his own arguments and evidence orally;

5) an opportunity to retain counsel or have the informal assistance of a friend, if the recipient desires;

6) a report written by the decision maker which informally states the reasons and the evidence relied on in reaching his decision; [40]

---

**38.** We note with approval the type of procedure followed in Brower v. Wohlgemuth, 371 F.Supp. 863 (E.D.Pa.1974).

**39.** In Twigger v. Schultz, 484 F.2d 856, 859 (3d Cir. 1973), Judge Gibbons pointed out:

A more reasonable construction of the entire Act, which we adopt, is that there may be presiding officers other than those listed in § 7(a), but that the procedural safeguards of the Act, and specifically the separation of functions safeguard of § 5(c), apply to such presiding officers to the same extent as to those presiding officers listed in § 7(a).

See also Withrow v. Larkin, —— U.S. ——, 95 S.Ct. 1456, 1464–1468, 43 L.Ed.2d 712 (1975).

Due process does not require that the decision maker be an administrative law judge appointed under 5 U.S.C. § 3105 for "proceedings required to be conducted in accordance with" 5 U.S.C. §§ 556 and 557. Of course, statutory criteria exceeding due process requirements are nevertheless controlling as to the credentials of the presiding administrator.

**40.** The presiding administrator's decision must rest solely on the evidence adduced at the hearing, in conformance with the hearing rules for receiving evidence. See Richardson v. Perales, *supra,* 402 U.S. at 400, 91 S.Ct. 1420; Goldberg v. Kelly, *supra,* 397 U.S. at 271, 90 S.Ct. 1011. The report "need not amount to a

7) an opportunity for all parties to receive and challenge the decision maker's report before it becomes final.[41]

See *Goldberg v. Kelly, supra,* 397 U.S. at 267–71, 90 S.Ct. 1011.

Although we are in partial agreement with the district court decision, we believe that the judgment of the district court should be vacated and remanded so that the district court can enter a new order defining the class in light of our ruling on the merits and in light of any further developments which have occurred since the final class determination on June 10, 1974.

Accordingly, the judgment of the district court will be vacated and the case remanded for entry of an appropriate judgment in accordance with this opinion.

full opinion or even formal findings of fact and conclusions of law." Goldberg v. Kelly at 271, 90 S.Ct. at 1022.

**41.** Such report could be submitted in draft form to all concerned for comment before final adoption.