Nicholas **ANGLETON, Robert Wilcox, Ira Wallach, and Robert Natale, Plaintiffs,**

v.

Samuel R. **PIERCE, Jr., Secretary, U.S. Department of Housing and Urban Development, and Hudson Troy Towers Associates, Ltd., Defendants.**

Civ. A. No. 82–2163.

United States District Court, D. New Jersey.

Aug. 30, 1983.

Carl E. Ring, Union City, N.J., for plaintiffs.

Raymond E. Lamb, Lamb, Chappell, Hartung, Gallipoli & Coughlin, Jersey City, N.J., for Hudson Troy Towers.

Stephen Taylor, Asst. U.S. Atty., Newark, N.J., with Paul G. Leiman, Dept. of Housing and Urban Development, Washington, D.C., for HUD.

## OPINION

LACEY, District Judge.

This action is brought by certain tenants of Troy Towers Apartments, 380 Mountain Road, Union City, New Jersey, against the Secretary of the United States Department of Housing and Urban Development (HUD) and the plaintiffs' landlord, Hudson Troy Towers Associates, Ltd. (Associates), owner of the Apartments. The material facts are not in dispute. Hudson Troy Towers Apartments is an unsubsidized, rent-controlled, 315-unit apartment project, the mortgage of which is insured by HUD pursuant to section 207 of the National Housing Act (the Act), as amended, 12 U.S.C. § 1713 (1976 & Supp.V 1981). Associates seeks to convert the apartments from conventional rental units to cooperative ownership by transferring the apartments' physical assets to a new corporation, Hudson Troy Towers Apartments Corp. Those wishing to reside in the cooperative would purchase shares of stock in the latter corporation, and would receive a 50-year proprietary lease in return. In order to substitute the new corporation for Associates as the mortgagor, HUD approval of the trans-

fer of assets is required. Plaintiffs, who have not subscribed to the cooperative plan and who will be subject to eviction if conversion occurs, seek to enjoin the Secretary from consenting to the transfer. They also seek a declaratory judgment that the Secretary's consent would violate 12 U.S.C. § 1713, and an order in the nature of mandamus. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1337, and 1361.

■ On August 26, 1982, Associates filed an answer. On October 15, 1982, plaintiffs moved for summary judgment and both defendants moved to dismiss the complaint.[1] Troy Towers Tenants Association also moved for permission to intervene as a defendant. Finding the matter not ripe for adjudication because HUD's review of the conversion proposal was still in the early stages, the court denied plaintiffs' motion, took defendants' motions under advisement, and adjourned the hearing of the Tenants Association's motion. On October 21, 1982, plaintiffs filed a notice of motion for rehearing of their summary judgment motion. This motion, which has not yet been formally ruled upon, is ruled upon at this time and is denied. The order entered on this opinion shall so provide.

■ On June 2, 1983, HUD granted preliminary approval for the transfer of assets from Associates to Hudson Troy Towers Apartment Corp., subject to two conditions. Amended Complaint ¶ 19. Since final approval will issue on compliance with those conditions and the issues involved are purely legal, the matter is now ripe for decision. *See Southeastern Pennsylvania Transportation Authority v. ICC*, 644 F.2d 253, 260–62 (3d Cir.1981); *Exxon Corp. v. FTC*, 588 F.2d 895, 903 (3d Cir.1978).

## I. BACKGROUND

■ The overall aim of the National Housing Act is to stimulate housing production and community development, so as to remedy the housing shortage and realize as soon as possible the "national goal ... of 'a decent home and a suitable living environment for every American family.'" 12 U.S.C. § 1701t (quoting Housing Act of 1949, § 2, 42 U.S.C. § 1441). In order to achieve these ends, Congress declared, "there should be the fullest practicable utilization of the resources and capabilities of private enterprise" and individual self-help. 12 U.S.C. § 1701t. *Cf.* Housing Act of 1949, § 2, 42 U.S.C. § 1441 (policy of Housing Act of 1949 is to encourage private enterprise "to serve as large a part of the total need as it can"); Department of Housing and Urban Development Act of 1965, §§ 2, 3(a), 42 U.S.C. §§ 3531 (HUD to "encourage the maximum contributions that may be made by vigorous private homebuilding and mortgage lending institutions to housing, urban development, and the national economy"), 3532(b) (Secretary of HUD to do the same). Congress particularly wished to encourage production of low- and moderate-income housing. *See, e.g., Gramercy Spire Tenants' Ass'n v. Harris*, 446 F.Supp. 814, 825 (S.D.N.Y. 1977) (citing cases).

Section 207 of the Act, 12 U.S.C. § 1713, has been described as "the major federal commitment to non-subsidized housing." *515 Associates v. City of Newark*, 424 F.Supp. 984, 988 (D.N.J.1977); *see Gramercy Spire, supra*, 446 F.Supp. at 818. It, like the Act's numerous other mortgage insurance provisions,[2] furnishes an incen-

---

1. Because Associates filed its motion to dismiss after it filed an answer, the motion will be treated as one for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *See Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.*, 429 F.Supp. 486, 487 n. 1 (E.D.N.Y.1977); *Frederick L. v. Thomas*, 408 F.Supp. 832, 834 (E.D.Pa.1976). In deciding a motion for judgment on the pleadings, as in deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), all of the non-moving party's allegations of fact are taken

as true. 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 12.15 at 2343 (2d ed. 1983).

Although matters outside the pleadings have been presented to the court, the court has excluded them from consideration. There is thus no need to convert these motions to motions for summary judgment.

2. Others include 12 U.S.C. §§ 1709 (mortgage insurance for one- to four-family residences and units in cooperative housing projects), 1715e (mortgage insurance for cooperative housing

tive for private parties to build and finance residential housing by authorizing the Secretary to guarantee mortgages given by private developers to private lenders. Section 1713 empowers the Secretary to insure mortgages covering · residential property held by governmental bodies or by

> any other mortgagor approved by the Secretary which, until the termination of all obligations of the Secretary under the insurance ..., is regulated or restricted by the Secretary as to rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment.

*Id.* § 1713(b)(2). The statute contains an explicit statement of congressional intent:

> The insurance of mortgages under this section is intended to facilitate particularly the production of rental accommodations, at reasonable rents, of design and size suitable for family living. The Secretary is, therefore, authorized and directed in the administration of this section to take action, by regulation or otherwise, which will direct the benefits of mortgage insurance hereunder primarily to those projects which make adequate provisions for families with children, and in which every effort has been made to achieve moderate rental charges.

*Id.* § 1713(b). The statute also defines "rental housing":

> The term ... means housing, the occupancy of which is permitted by the owner thereof in consideration of the payment of agreed charges, whether or not, by the terms of the agreement, such payment over a period of time will entitle the occupant to the ownership of the premises....

*Id.* § 1713(a)(6). The statute provides no guidance as to the meaning of "reasonable rents," "moderate rental charges," or "reasonable return on the investment."

Pursuant to § 1713, the Secretary (then Federal Housing Commissioner)[3] agreed to insure the mortgage on Troy Towers Apartments and entered into a regulatory agreement with the Apartments' original mortgagor, Troy Village, Section C, Inc., on September 16, 1964. Complaint ¶ 13 & Ex. C. This agreement provides, *inter alia*, that the mortgagor will not rent premises for a period of more than three years at a time, will not charge rents in excess of those approved by the Secretary, and will not, without the Secretary's prior written approval, convey the mortgaged property or require, as a condition of occupancy, any consideration other than first month's rent and a month's security. *Id.*, Ex. C, ¶¶ 4(a), 6(a), 6(g). If the mortgagor violates any provision of the agreement, the Secretary may declare a default and may foreclose, take possession, or seek judicial relief. *Id.*, Ex. C, ¶ 10. The mortgagor warrants that it will not execute any agreement having provisions contrary to those of the regulatory agreement, and states that the regulatory agreement shall control the rights and obligations set forth therein. *Id.*, Ex. C, ¶ 15. The regulatory agreement is binding on the original mortgagor's successors, heirs and assigns. *Id.*, Ex. C. Although the complaint does not allege that Associates is the successor, heir or assign of the original mortgagor, this conclusion can fairly be drawn from the allegations that Associates owns the Apartments and that the mortgage is still insured by HUD.[4]

HUD has promulgated regulations that govern its administration of the section 207 mortgage insurance program, 24 C.F.R. §§ 207.1–.499 (1982), as well as an Insured

---

projects), 1715*l* (mortgage insurance for housing for moderate income and displaced families), 1715m (mortgage insurance for servicemen), and 1738 (mortgage insurance for veterans).

3. The Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3534(a), transferred the Federal Housing Commissioner's

"functions, powers and duties" to the Secretary of HUD.

4. The original amount of the mortgage note was $7,500,000. Complaint ¶ 11 & Ex. C. According to plaintiffs, approximately $5,500,000 remain to be paid. *Id.* ¶ 11.

Project Servicing Handbook, HM 4350.1, which sets out policies and procedures regarding changes in ownership of property covered by a HUD-insured mortgage. Neither source discusses conversion of rental property to cooperative ownership; the standards for such conversions appear in HUD Notice H–80–83, 45 Fed.Reg. 67,777 (1980). The notice states that HUD's interim policy (pending full-scale departmental review) is "to avoid conversions that would involve moderate cost rental housing or a significant portion of tenants with limited financial resources," without "inhibit[ing] conversions unreasonably where these concerns are not relevant." *Id.* Where a mortgage is insured under 12 U.S.C. § 1713, the Secretary may approve a transfer of assets to a purchaser who intends to convert to cooperative ownership "only where the standard transfer requirements are satisfied and the project rents prior to conversion equal or exceed 125 percent of the Section 8 Existing Housing FMRs [fair market rents] for the same location and type and size of units." *Id.* at 67,778.[5] The owner or converter must also provide tenants with certain protection and benefits, including notice and an opportunity to purchase their units at the lowest sale price at which the unit is offered, before the units are offered for sale to others. *Id.*

The New Jersey Legislature has also promulgated a comprehensive scheme regulating the conversion of rental units to condominiums or cooperatives, N.J.S.A. 2A:18–61.1 *et seq.* (West Supp.1983). N.J. S.A. 2A:18–61.1 k provides that a tenant may be removed from his apartment if "[t]he landlord or owner of the building … is converting from the rental market to a condominium, cooperative or fee simple ownership." No action for possession may be brought until the act has been complied with. N.J.S.A. 2A:18–61.1 k. The statute provides that the landlord must give ten-

ants 60 days' notice of his intent to convert, must give them an exclusive 90-day option to purchase their units, and must notify them of the option and of their statutory rights. N.J.S.A. 2A:18–61.8. After giving this notice, he may give a notice of eviction; however, three years' prior notice is required before a dispossession action may be instituted and, if there is a lease, the action must also await its expiration. N.J. S.A. 2A:18–61.2 g. A tenant who receives a notice of eviction under N.J.S.A. 2A:18–61.2 g is entitled to receive from the owner "moving compensation of [sic] waiver of payment of 1 month's rent." N.J.S.A. 2A:18–61.10. Within 18 months of receiving the notice of eviction, the tenant may also request that the landlord provide him with "the rental of comparable housing," N.J.S.A. 2A:18–61.11 a, which is defined as housing that is safe, sanitary, "located in an area not less desirable than the area in which the tenant then resides," and "provided with facilities equivalent to that provided by the landlord in the dwelling unit … in which the tenant then resides," in regard to apartment size and rent range, *inter alia.* N.J.S.A. 2A:18–61.7 a. In any proceeding to evict the tenant, the landlord must prove that the tenant was offered comparable housing. N.J.S.A. 2A:18–61.11 a. If the court is not satisfied that the tenant was offered such housing, it may grant up to five stays of one year each; no more than a one-year stay may be granted if the owner waives payment of five months' rent. N.J.S.A. 2A:18–61.11 a, c. Senior citizens and disabled persons are entitled to additional protection. N.J.S.A. 2A:18–61.22 *et seq.*

On June 17, 1981, all tenants at Troy Towers Apartments received notice of Associates' intent to convert to cooperative ownership, together with a copy of the 228-page plan of conversion. Complaint ¶ 6 & Ex. A. Under that plan, the new corpo-

**5.** "Section 8" refers to Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f. The Section 8 program provides rent subsidies to lower-income families living in private housing. In order to determine the maximum rent that an owner can charge to

a § 8 tenant, the Secretary must calculate the fair market rental for "existing or newly constructed rental dwelling units of various sizes and types in the market area suitable for occupancy by persons assisted under this section." *Id.* § 1437f(c)(1).

ration, Hudson Troy Towers Apartment Corp., would issue 135,200 shares of $1 par value common stock; between 500 and 750 shares were allocated to each apartment, depending on the unit's size and elevation. *Id.* ¶ 8. Those wishing to reside in the cooperative would purchase the shares assigned to the unit. *Id.* ¶ 9. Each tenant was given an exclusive option, for a ninety-day period (subsequently extended), to subscribe for the shares allocated to his unit at the price of $74 per share (a total of $25,000 to $45,000 per unit). *Id.* ¶¶ 9–10. If the tenant did not subscribe within that period, the shares would be offered to the public at $94 per share. *Id.* ¶ 10. As of April 13, 1982, more than 60% of the tenants had subscribed; plaintiffs allege that some subscribed under "economic duress." *Id.* ¶¶ 15, 23.

On or about August 18, 1981, all tenants of Troy Towers received a three-year notice to quit and demand for possession, terminating their tenancies as of September 10, 1984 (unless a written lease expired after that date), because of the landlord's intent to convert the premises to cooperative ownership. Complaint ¶ 7 & Ex. B. Plaintiffs, who have not subscribed, state that they face eviction as of September 18, 1984. *Id.* ¶¶ 7, 16.

Plaintiffs do not contest Associates' compliance with either HUD's or New Jersey's cooperative conversion requirements. Rather, they argue that the Secretary cannot, under any circumstances, approve the conversion of rental housing to a cooperative, when the mortgage on the property is insured pursuant to 12 U.S.C. § 1713. They contend that the Secretary's consent to the transfer of assets would violate § 1713 and would deprive them of a constitutionally protected property interest. In addition, they assert that the stock subscription agreements are invalid because they violate the terms of the regulatory agreement.

Defendants raise a number of arguments in favor of dismissing the complaint. Initially, Associates asserts that plaintiffs lack standing to maintain this suit.[6] Next, both the Secretary and Associates argue that HUD approval of the proposed transfer would not violate § 1713; in addition, the Secretary contends that plaintiffs have no private right of action under the statute. Both defendants assert that plaintiffs fail to state a claim under either the regulatory agreement or the Constitution. Finally, Associates argues that an order of mandamus should not issue because the administrative action in question is discretionary.

## II. STANDING

■ Associates appears to argue that plaintiffs lack standing because they have no legal right to the relief they seek. Associates has confused standing with failure to state a claim. The two are conceptually distinct: when standing is at issue, the court asks whether the plaintiffs are the proper parties to bring the action, whereas failure to state a claim focuses not on the parties but on the existence of a cause of action (i.e., on the merits). *Kirby v. Department of HUD*, 675 F.2d 60, 63–64 (3d Cir.1982); *Bowman v. Wilson*, 672 F.2d 1145, 1151 n. 10 (3d Cir.1982). Plaintiffs must show a "legal interest" in order to state a claim, but not in order to have standing. *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 163–64, 90 S.Ct. 832, 835–36, 25 L.Ed.2d 192 (1970).

■ Where, as here, the plaintiffs challenge federal administrative agency action, the court evaluates standing by making two inquiries:

(1) the constitutional one—"whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise," and (2) prudential

---

**6.** An additional argument made by Associates, that the court lacks subject matter jurisdiction because plaintiffs have not alleged $10,000 in controversy, is meritless. The $10,000 jurisdictional requirement of 28 U.S.C. § 1331 was repealed in 1976 (for federal question cases against the government) and in 1980 (for all other federal question cases).

considerations, including, "whether the interest sought to be protected by the complaint is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question."

*Kirby, supra,* 675 F.2d at 64 (quoting *Association of Data Processing Service Organization, supra,* 397 U.S. at 152, 153, 90 S.Ct. at 829, 830) (footnote omitted). The requirement that the plaintiff show actual injury is grounded in Article III's limitation of federal court jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. The Supreme Court has recently stated that the plaintiff must not only show injury, but must also allege that the injury " 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982) (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). In this case, plaintiffs have clearly alleged injury in fact, since they allege that the conversion plan presents them with the choice of investing $25,000 to $45,000 or being evicted, and allege that they face eviction as a result of their non-subscription. Complaint ¶¶ 9–10, 16, 21. It is also obvious that their injury can be traced to HUD's approval of the conversion plan and to Associates' conveyance of the property, and would be redressed by a decision favorable to the plaintiffs. Thus, plaintiffs satisfy the constitutional test for standing.

 Since plaintiffs assert both statutory and constitutional claims, the court must inquire whether they satisfy the "zone of interest" test for each.[7] The right to continued occupancy of federally-regulated housing has, in certain circumstances, been found to be a "property interest" protected by the due process clause of the fifth amendment. *E.g., Caramico v. Secretary of HUD,* 509 F.2d 694, 700–01 (2d Cir.1974); *Joy v. Daniels,* 479 F.2d 1236, 1239–42 (4th Cir.1973). Thus, plaintiffs' interest in remaining at Troy Towers Apartments is arguably within the zone of interest to be protected by the fifth amendment, and plaintiffs have standing to bring their constitutional claim. It is less clear that plaintiffs' interest falls within the "zone of interest" to be protected by the National Housing Act. The Act[8] was intended to benefit low and moderate-income families. *E.g., Perry v. Housing Authority,* 664 F.2d 1210, 1212–13 (4th Cir.1981); *Falzarano v. United States,* 607 F.2d 506, 509 (1st Cir.1979); *Davis v. Romney,* 490 F.2d 1360, 1365 (3d Cir.1974); 12 U.S.C. §§ 1701t, 1713(b). Arguably, the complaint is deficient because plaintiffs fail to allege that they belong to such families.[9] *Cf. River Park Tenants Association v. 3600 Venture,* 534 F.Supp. 45, 49 (E.D.Pa.1981) (tenants suing under state condominium conversion law creating exception for "aged, blind or disabled" tenants may lack standing because they fail to allege that they are aged, blind or disabled). The court believes that plaintiffs fall within the zone of interest to be protected by the Act, however, for two reasons. First, although Congress intended "primarily" and "particularly" to benefit low- and moderate-income families, 12 U.S.C. § 1713(b), it is arguable that the very use of those words indicates a secondary intent to benefit other tenants as well.

7. The "zone of interest" test, of course, does not apply to plaintiffs' contract claim.

8. For purposes of determining standing, the court considers the entire Act rather than any one provision. *Ellis v. Dep't of HUD,* 551 F.2d 13, 16 (3d Cir.1977); *Davis v. Romney,* 490 F.2d 1360 (3d Cir.1974).

9. Although materials outside the complaint are not relevant to these motions, it is interesting to note that the plan of conversion, submitted as an exhibit to Associates' brief, reveals that Troy Towers Apartments are hardly spartan. All apartments have parquet floors and central air conditioning; with the exception of the lobby floor apartments, all have dishwashers and terraces equipped with glass doors. The complex also contains a four-story parking garage and a swimming pool with adjacent lounging and deck areas. Brief of Defendant Associates, Exhibit (Plan of Conversion), at 23–24, 171, 192.

*Cf. Ellis v. Department of HUD,* 551 F.2d 13, 16 (3d Cir.1977) (HUD had guaranteed mortgage on building in which plaintiff tenants lived; court stated that it was faced "not with low-income families in subsidized housing, but with families in nonsubsidized housing" and, without further discussion of plaintiffs' income levels, found that they had standing to sue under National Housing Act). Second, complaints are to be liberally construed; the court may infer that plaintiffs did not subscribe for the shares of stock because they lacked the resources to do so. The court concludes that plaintiffs do have standing to bring both statutory and constitutional claims challenging HUD's action.[10]

### III. FAILURE TO STATE A CLAIM

Plaintiffs attempt to assert three claims: (1) a claim that HUD's action violates the governing statute, 12 U.S.C. § 1713; (2) a claim that HUD's action violates the due process clause of the fifth amendment; and (3) a claim against Associates, based on the regulatory agreement between HUD and the original mortgagor. The court will consider each of these in turn.

1. *Review under Administrative Procedure Act.*

■ Plaintiffs assert that HUD's consent to the transfer of Troy Towers' assets and the cooperative conversion would be inconsistent with 12 U.S.C. § 1713 because it would allow both the rent and the return on investment to exceed the "reasonable" levels mandated by the statute. Although plaintiffs do not invoke the Administrative Procedure Act (APA) in their complaint, this court's review of the Secretary's action is governed by section 10 of the APA, 5 U.S.C. § 701–706 (1976), which provides for judicial review of "final agency action," *id.* § 704, unless review is precluded by statute or the action is "committed to agency discretion by law." *Id.* § 701(a). In this case, HUD's preliminary approval of the

transfer of assets is reviewable as a "final order"; because final approval will issue as soon as Associates complies with the two conditions contained in the letter of preliminary approval, the impact of the preliminary approval is " 'sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage.' " *Southeastern Pennsylvania Transportation Authority, supra,* 644 F.2d at 262. Neither the National Housing Act nor the APA precludes judicial review of the Secretary's conduct under § 1713.

■ Plaintiffs have no right to review of the Secretary's decision insofar as they challenge the specific rents and rate of return allowed, because these determinations are committed to the Secretary's discretion by law. "When a statute is drawn granting such broad discretion as to provide no law to apply, there is a strong indication that the 'committed to agency discretion' exception in the Administrative Procedure Act [5 U.S.C. § 701(a)(2) ] was intended to apply." *Gatter v. Nimmo,* 672 F.2d 343, 345 (3d Cir.1982) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)). Here, § 1713 uses the broad term "reasonable" to describe both the rents and rates of return the Secretary may allow, thus leaving the Secretary with extremely wide discretion in both areas. The Secretary's regulations provide no further guidance as to allowable rents. *See* 24 C.F.R. § 207.19(e) (1982). The regulations do discuss rate of return, but govern only the times when and sources from which dividends or other distributions may be declared, *id.* § 207.19(b); plaintiffs have not alleged that either Associates or the new corporation, Hudson Troy Towers Apartments Corp., has declared or is about to declare an impermissible dividend. Assuming that HUD Notice H–80–83, *supra,* is binding on the Secretary, it too is silent as to allowable rates of return, and plaintiffs have not alleged that the Secretary

---

10. This conclusion as to standing determines only that plaintiffs may bring statutory and constitutional claims; it does not determine wheth-er they have stated claims under either the statute or the Constitution. *See supra* p. 726.

has violated its provision that the rents of the building to be converted must equal or exceed 125% of Section 8 fair market rents for the same location and type of unit.

A number of cases have held that the Secretary's decisions approving rent increases under various provisions of the National Housing Act are committed to agency discretion and thus not judicially reviewable. *E.g., Falzarano, supra,* 607 F.2d at 512 (12 U.S.C. § 1715*l*(d)(3)); *Harlib v. Lynn,* 511 F.2d 51, 56 (7th Cir.1975) (same); *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 302–04 (2d Cir.1971) (same); *Hahn v. Gottlieb,* 430 F.2d 1243, 1249–51 (1st Cir.1970) (same); *Feldman v. HUD,* 430 F.Supp. 1324, 1325–26 (E.D.Pa.1977) (12 U.S.C. § 1701q); *People's Rights Organization v. Bethlehem Associates,* 356 F.Supp. 407, 410–11 (E.D.Pa.) (12 U.S.C. § 1715z–1), *aff'd without opinion,* 487 F.2d 1395 (3d Cir.1973). This court adopts the reasoning of the First Circuit in *Hahn, supra* (followed by that court in *Falzarano, supra* ). In *Hahn,* the court found judicial review inappropriate because "courts are ill-equipped to superintend economic and managerial decisions of the kind involved [in rent determinations]," 430 F.2d at 1249, and because such judicial superintendence would "discourage the increased involvement of the private sector" that is the goal of the National Housing Act and would have an adverse effect on agency performance. *Id.* at 1250. The *Hahn* court found that these considerations, coupled with the broad statutory language, provided clear and convincing evidence that Congress intended to commit the calculation of permissible rents to HUD's discretion. The same considerations operate in this case. The court concludes that it may not consider plaintiffs' objections to the rent increase and rate of return that cooperative conversion would entail (set forth at some length in Complaint, Ex. D), insofar

as their objections are addressed to the specific details of the conversion plan.

The court understands the plaintiffs to be making a second argument, however, objecting to the transfer of assets on the grounds that a cooperative is not an eligible mortgagor under § 1713. Although plaintiffs do not spell this out, they argue that the conversion would take Troy Towers out of the reasonable rental housing market because the tenants would be required to purchase shares of stock at a price "several hundred times the reasonable monthly charges [presumably, the current monthly charges], at least 50% of which must be paid in advance." Plaintiffs' Brief, June 9, 1983, at 4.[11] Plaintiffs do not argue that a cooperative cannot be considered rental property. Nor do they assert that the cost of the shares is exorbitant, in relation to the value of the proposed cooperative units. Rather, they object to the fact that the initial investment is high, in relation to the monthly charges they were accustomed to paying. Since the requirement of a relatively sizeable initial investment is a standard feature of owner-occupied cooperatives, it appears that plaintiffs are objecting to the cooperative form of ownership itself, and are arguing that the Secretary may not insure any cooperative under § 1713.

Arguably, the Secretary's decision regarding transfer of assets to a cooperative is also committed to his discretion by law. Section 1713 authorizes the Secretary to insure mortgages on property held by "any other mortgagor" approved and regulated by him; this language appears to give the Secretary broad discretion. A determination that a decision is committed to agency discretion by law does not foreclose judicial review altogether, however. Although a court, after finding an action committed to agency discretion, may not consider an allegation that the agency abused its discretion or acted unreasonably, it may

---

**11.** The Complaint, ¶ 9, states that the stock must be "paid for in full" when conversion occurs. Exhibit D to the Complaint, however, states, "The terms are 10% down and the balance on closing or at closing 46% cash and a note for the balance at 10% due in ten years on a fifteen year pay out plan. Half of the 46% can be financed for eight years upon a ten year pay out plan at ¾% below Citibank rate at the closing date."

still consider a charge that the agency's action "violates a constitutional, statutory, or regulatory command." *Local 2855, AFGE v. United States*, 602 F.2d 574, 580 (3d Cir.1979).[12] In the housing context, the Third Circuit has specifically stated that "HUD's broad discretion in approving projects must be exercised in a manner consistent with the national housing objectives set forth in the several applicable statutes ... [A]t the very least, [a] court can review a HUD decision to assure itself that it is not in conflict with those policies." *Kirby, supra,* 675 F.2d at 68. Thus, in this case, the court may consider plaintiffs' argument that HUD's approval of a cooperative as a mortgagor exceeds HUD's authority under § 1713.

The language of § 1713 is not determinative. On the one hand, it says nothing at all about cooperatives, which could lead to the conclusion that Congress did not intend cooperatives to be covered by this section. On the other hand, members of a cooperative rent their apartments from the corporation whose stockholders they are, *see* Complaint ¶ 9; thus, it is arguable that the "rental accommodations" of which § 1713 speaks can include cooperative units. The statute defines "rental housing" only as that which is permitted in consideration of payment of "agreed charges," 12 U.S.C. § 1713(a)(6); it does not require that the charges be assessed monthly, yearly, or at any other specific interval. Thus, the costs of the cooperative shares (plus monthly assessments, if any) may be regarded as the "agreed charges" furnishing the consideration for the 50-year lease which cooperative members will receive. Even if the cooperative conversion is viewed as more akin to a sale than a lease of real estate, the statute does not appear to prohibit such transactions: premises may be considered "rental housing" whether or not payment of the agreed charges overtime will entitle the occupant to ownership of those premises, *id.,* and the Secretary may guarantee mortgages on property of a mortgagor which is regulated or restricted as to "rents *or sales.*" *Id.* § 1713(b)(2) (emphasis added).

The legislative history of § 1713 sheds more light on Congress' intent. As originally enacted, the statute provided for insurance on

first mortgages, other than mortgages defined in section 201(a) of this title, covering property held by Federal or State instrumentalities, private limited dividend corporations, or municipal corporate instrumentalities of one or more states, formed for the purpose of providing housing for persons of low income which are regulated by the [Federal Housing] Administrator as to rents, charges, capital structure, rate of return, or methods of operation.

National Housing Act, ch. 847, § 207, 48 Stat. 1246, 1252 (1934). In 1938, Congress expanded the list of eligible mortgagors to include

[p]rivate corporations, associations, *cooperative societies which are legal agents of owner-occupants,* or trusts formed or created for the purpose of rehabilitating slum or blighted areas, or providing housing for rent or sale, and which possess powers necessary therefor and incidental thereto, and which, until the termination of all obligations of the Administrator under such insurance, are regulated or restricted by the Administrator as to rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment.

---

**12.** In other words, a finding of commitment to agency discretion narrows the scope of judicial review by eliminating review under 5 U.S.C. § 706(2)(A) (court to set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), but does not affect review under 5 U.S.C.

§§ 706(2)(B) (court to set aside agency actions found to be "contrary to constitutional right, power, privilege, or immunity") and 706(2)(C) (court to set aside actions found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

National Housing Act Amendments, ch. 13, § 3, 52 Stat. 8, 17 (1938) (emphasis added). At the same time, Congress added a definition of "rental housing" that is essentially the same as the present one.[13]

In the Housing Act of 1950, ch. 94, § 106, 64 Stat. 48, 52–53, Congress added the express provision that the insurance of mortgages under § 207 of the National Housing Act, 12 U.S.C. § 1713, is intended to facilitate the production of rental accommodations of design and size suitable for family living at reasonable rents. See *supra* pp. 723–724. The 1950 Act also amended the National Housing Act by adding a new § 213, 12 U.S.C. § 1715e, which provided for mortgage insurance on property held by

> (1) a nonprofit cooperative ownership housing corporation or nonprofit cooperative ownership housing trust, the permanent occupancy of the dwellings of which is restricted to members of such corporation or to beneficiaries of such trust; or
>
> (2) a nonprofit corporation or nonprofit trust organized for the purpose of construction of homes for members of the corporation or for beneficiaries of the trust;
>
> which corporations or trusts are regulated or restricted for the purposes and in the manner provided in paragraphs numbered (1) and (2) of subsection (b) of section 207 of this title.

Housing Act of 1950, ch. 94, § 114(a), 64 Stat. 48, 54–55. The Senate Report accompanying the bill states that § 213 was intended to "liberaliz[e] the present provisions for FHA insurance of mortgage loans for projects of housing cooperatives" by giving more favorable insurance terms to "a nonprofit cooperative ownership corporation or trust, building housing for occupancy by its members (i.e., rental-type

housing)." S.Rep. No. 1286, 81st Cong., 2d Sess., *reprinted in* 1950 U.S.Code Cong. & Ad.News 2021, 2039.[14] The Conference Report states that the new § 213 "would take the place of the existing provisions of the law with respect to the insurance of the mortgages of cooperative housing projects now contained in section 207 of [the National Housing Act]." Conf.Rep. No. 1893, 81st Cong., 2d Sess., *reprinted in* 1950 U.S.Code Cong. & Ad.News 2141, 2145. The two provisions were not in fact coextensive, however, as section 213, 12 U.S.C. § 1715e, required the cooperatives to be non-profit, whereas section 207, 12 U.S.C. § 1713, did not. The 1950 Act did not change the list of mortgagors eligible for insurance under section 207, 12 U.S.C. § 1713(b)(2).

■ The description of eligible § 207 mortgagors assumed its present form in 1961, when Congress deleted the list of mortgagors added in 1938, and substituted the "any other mortgagor" language of the current statute. The Senate Report accompanying the bill explains that the amendment was intended to broaden the scope of § 207:

> [The amendment] would permit individuals, groups of individuals, or partnerships to be FHA section 207 rental housing mortgagors as now permitted for other FHA multifamily housing programs. Under present law, a section 207 mortgagor which is not supervised under Federal or State law, is required to be a private corporation, association, cooperative society, or trust. Under the bill any mortgagor approved by the [Federal Housing] Commissioner could be a mortgagor under the section 207 program.

S.Rep. No. 281, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad.

---

13. The only difference is that the present definition states that housing may be considered rental housing whether or not the payment of agreed charges will entitle the occupant to ownership of "the premises or space in a mobile home court or park properly arranged and equipped to accommodate mobile homes," 12 U.S.C. § 1713(a)(6), whereas the 1938 definition

lacked any reference to mobile home courts or parks.

14. The fact that the Senate considered cooperative housing to be "rental-type housing" provides further support for the argument, outlined *supra* p. 730, that cooperative units are "rental housing" within the meaning of 12 U.S.C. § 1713.

News 1923, 1968. All of the mortgagors named in the previous version of § 207(b) remained eligible for § 207 mortgage insurance; the Senate Report states that the amendment was intended "to permit individuals, groups of individuals, or partnerships to be rental housing mortgagors if approved by Commissioner (*in addition to those under present law*)." S.Rep. No. 281, *supra, reprinted in* 1961 U.S.Code Cong. & Ad.News 1923, 2024 (emphasis added).

The legislative history clearly shows that Congress intended to allow cooperatives to be eligible § 207 mortgagors. The text of the present § 207(b)(2), 12 U.S.C. § 1713(b)(2), is virtually identical to the 1961 version.[15] The Senate Report accompanying the 1961 amendment makes clear that Congress intended the "any other mortgagor" language to subsume the listing of specific eligible mortgagors added in 1938 and contained in the then-current version of § 207. Since cooperatives were specifically listed as eligible mortgagors before the 1961 amendment, they are eligible mortgagors under § 207 as it stands today. The court sees no reason (nor have plaintiffs advanced any) why the Secretary may not approve a transfer of assets from one eligible § 207 mortgagor to another. Other provisions of the National Housing Act indicate Congress' affirmative intent to encourage cooperative housing. *See, e.g.,* 12 U.S.C. §§ 1709(n) (insurance of mortgages on individual cooperative units), 1715e (discussed *supra* p. 731), 1715z (mortgage assistance payments for homeowners and cooperative members), 1715z–1 (interest reduction payments for renters and cooperative members), 1715z–8(d) (mortgage assistance payments for middle-income cooperative members). The court concludes that the Secretary's approval of the transfer of the assets of Troy Towers Apartments from defendant Associates to a cooperative does not violate 12 U.S.C. § 1713.

◼ Plaintiffs' claim that the Secretary's consent to the transfer of Troy Towers' assets would violate 12 U.S.C. § 1713 must be dismissed. In addition, plaintiffs are not entitled to mandamus relief because they have not shown that the Secretary owes them a clear, ministerial, and nondiscretionary duty. *See Mattern v. Weinberger,* 519 F.2d 150, 156 (3d Cir. 1975), *vacated on other grounds,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976). Since plaintiffs seek neither damages against the Secretary nor any relief at all against Associates under § 1713, the court need not consider the Secretary's argument that plaintiffs have no private right of action under § 1713.

2. *Due process claim.*

◼ Next, plaintiffs assert that the Secretary, by approving the conversion of Troy Towers to a cooperative, will deprive them of a constitutionally protected property interest in "reasonable rental housing." Although plaintiffs do not invoke a particular constitutional provision, presumably they are attempting to state a claim under the due process clause of the fifth amendment. In order to allege a due process violation, plaintiffs must allege (1) that they have a constitutionally protected property interest, (2) that they were deprived of that interest by government action, and (3) that the procedural safeguards afforded the interest are insufficient to protect it. *See, e.g., Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Here the complaint is obviously defective because plaintiffs fail to plead that HUD's procedures were inadequate. They admit that they received notice of the intent to convert, that they had the opportunity to submit written objections to HUD's main office in Washington, D.C., and that they received a written response from that office, Complaint ¶¶ 6, 16–17 & Exs. A, D, E, but do not allege that these procedures failed to protect their interest. Dismissal

---

**15.** The only changes have been the substitution of "Secretary" for "Commissioner" and of "General Insurance Fund" for "Housing Fund."

of the relevant portions of the complaint would be proper for this reason alone.

■ Dismissal with leave to amend would be futile, however, because plaintiffs do not have a constitutionally protected property interest which would allow them to remain in their apartments under a conventional rental arrangement. Since the Supreme Court's decision in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), it has been clear that

[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it .... Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709. See, *e.g.*, *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). In this case, plaintiffs argue that their property interest arises from three sources: 12 U.S.C. § 1713; the regulatory agreement between the original mortgagor and HUD; and the Union City rent stabilization ordinance, Union City, N.J.Rev. Ordinances ch. 12 (Supp.1981).[16] Upon examination, however, it is clear that none of the three confers on plaintiffs a legitimate claim of entitlement.

For the reasons stated above, § 1713 does not give plaintiffs an entitlement to have Troy Towers remain as conventional

rental units, rather than a cooperative. Nor does § 1713 give tenants a protected property interest in a certain rental charge. *Gramercy Spire, supra,* 446 F.Supp. at 824–25; *Rodriguez v. Towers Apartments, Inc.,* 416 F.Supp. 304, 308 (D.P.R.1976); *cf. Falzarano, supra,* 607 F.2d at 513 (12 U.S.C. § 1715*l*(d)(3) mortgage insurance and subsidy program does not give plaintiff tenants any constitutionally protected property interest); *Ellis v. HUD, supra,* 551 F.2d at 17 (same, for 12 U.S.C. § 1715k mortgage insurance program); *Grace Towers Tenants Ass'n v. Grace Housing Development Fund Co.,* 538 F.2d 491, 494 (2d Cir.1976) (same, for 12 U.S.C. § 1715*l*(d)(3) mortgage insurance and subsidy program); *Harlib v. Lynn, supra* (same); *Tenants' Council of Tiber Island-Carrollsburg Square v. Lynn,* 497 F.2d 648 (D.C.Cir. 1973) (same, where mortgage insured under 12 U.S.C. § 1715k), *cert. denied,* 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974); *People's Rights Organization, supra,* 356 F.Supp. at 411–13 (same, for 12 U.S.C. § 1715z–1 mortgage insurance and subsidy program). *But cf. Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483 (9th Cir.1974) (tenants in project insured and subsidized under 12 U.S.C. § 1715*l*(d)(3) have constitutionally protected property interest in continuing to receive benefits of low cost housing); *Marshall v. Lynn,* 497 F.2d 643 (D.C. Cir.1973) (same), *cert. denied,* 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974). Because plaintiffs have no rights under the regulatory agreement, *see infra* at pp. 734–736, the regulatory agreement cannot be the source of a protected property interest either. That leaves the Union City rent control ordinance as the only possible source of an entitlement.

The Union City ordinance cannot be interpreted to give plaintiffs a protected interest in maintaining their present rental arrangements, however.[17] The ordinance is a fairly typical rent control law, estab-

---

**16.** Plaintiffs allege that they are tenants under lease, Complaint ¶ 2, but do not argue that their leases create any entitlements.

**17.** Several courts have held that a local rent control ordinance gives a tenant a protected property interest in the protections afforded them by the ordinance. *See Gramercy Spire Tenants' Ass'n v. Harris,* 446 F.Supp. 814, 825–27

lishing a base rent (as of March 1, 1973) and permitting increases only in accordance with its terms. It says nothing about cooperative conversion. Any attempt to construe the ordinance as prohibiting such conversions would run afoul of N.J.S.A. 2A:18–61.1 *et seq.*, which sets out a comprehensive scheme regulating the conversion of conventional rental units to condominiums or cooperatives. *See supra* p. 725. As this court stated on a previous occasion, the provisions of N.J.S.A. 2A:18–61.1 *et seq.* make clear that

> the New Jersey Legislature intended its legislation to be the exclusive source of law regulating the eviction of tenants from apartments being converted to condominiums [and cooperatives] .... [Its] complex and thorough treatment of the question of what steps are necessary before eviction occurs is evidence of a clear and unmistakable intent to have a state-wide policy on removal of tenants when an apartment is converted .... Similarly, the very depth of the legislation supports the belief that the legislature intended the rules on this subject to be uniform throughout the state, without variation among municipalities and with its legislation being exclusive in the field.

*Claridge House One, Inc. v. Borough of Verona,* 490 F.Supp. 706, 711 (D.N.J.), *aff'd without opinion,* 633 F.2d 209 (3d

Cir.1980). Thus, even if the language of the Union City ordinance could be construed to ban conversion of rent-controlled apartments to cooperative units, the ordinance would be preempted by the comprehensive state scheme, which regulates but does not preclude conversions. *Id.*[18] Given this result, the ordinance cannot be the source of a property interest in maintaining conventional rental arrangements.

In sum, neither 12 U.S.C. § 1713 nor the regulatory agreement nor the Union City rent stabilization ordinance can be the source of the interest plaintiffs seek to assert. Plaintiffs fail to state a constitutional claim, and the portions of the complaint which attempt to do so must be dismissed.

### 3. *Claims under the regulatory agreement.*

Finally, plaintiffs seek a declaration that the subscription agreements by which current Troy Towers tenants subscribed for shares of cooperative stock, see Complaint ¶ 9, are invalid because they violate the regulatory agreement between HUD and the original mortgagor.[19] Plaintiffs also seek an injunction prohibiting Associates from enforcing or claiming any rights under the subscription agreements. Plaintiffs do not request any relief against HUD on this theory. HUD, however, argues

---

(S.D.N.Y.1977); *515 Associates v. City of Newark,* 424 F.Supp. 984, 993–94 (D.N.J.1977). In those cases, however, plaintiffs sought to challenge HUD-approved rent increases which exceeded those allowable under local law; cooperative conversions were not at issue.

**18.** Plaintiffs do not challenge the constitutionality of any of the New Jersey statutes relating to condominium and cooperative conversion.

In a related case, certain other tenants of Troy Towers (represented by one of the attorneys who represent plaintiffs in the present case) sued Associates and Irwin Kimmelman, Attorney General of the State of New Jersey, seeking a declaratory judgment holding N.J.S.A. 2A:18–16.1 k unconstitutional on its face as violative of the due process and equal protection clauses of the fourteenth amendment. They also sought a declaration that the notices of eviction served pursuant to that statute were null and void, and an injunction prohibiting Associates from evicting them under the challenged portion of the statute. This court granted Associates' motion

(in which defendant Kimmelman joined) to dismiss the complaint. *Simons v. Hudson Troy Towers Associates, Ltd.,* No. 82–2398 (D.N.J. Nov. 22, 1982) (order dismissing complaint, with costs to defendants).

**19.** Plaintiffs assert that the subscription agreements violate the regulatory agreement's provisions that the mortgagor will not rent premises for a period of more than three years at a time, will not charge rent in excess of a schedule approved by the Secretary, and will not, without the Secretary's written approval, convey the mortgaged property or require any consideration for occupancy other than first month's rent and one month's security. *See supra* p. 723. Since the Secretary has already given preliminary written approval of conveyance of the property and of a conversion scheme which will require consideration other than first month's rent and one month's security, plaintiffs' only possible claims would be under the three-year lease and rent-schedule provisions.

that plaintiffs fail to state a claim against either defendant under the regulatory agreement.

■ First, it is unclear exactly what type of claim plaintiffs are attempting to assert. They would have no rights under any of the subscription agreements, since they are not parties to those agreements, Complaint ¶ 16, and since it would be impossible for them to argue that they are third-party beneficiaries of agreements which will result in their eviction. The other possible source of contract rights is the regulatory agreement. Because they are not parties to that agreement, *id.* ¶ 13 & Ex. C, plaintiffs would have to sue as third-party beneficiaries. The complaint does not allege that the plaintiffs are third-party beneficiaries of the regulatory agreement; arguably, this omission alone should lead to dismissal of the relevant portions of the complaint for failure to state a claim. *See Picture Lake Campground, Inc. v. Holiday Inns,* 497 F.Supp. 858, 862 (E.D. Va.1980); *Hauer v. Bankers Trust New York Corp.,* 425 F.Supp. 796, 800 (E.D.Wis. 1977). The court will assume, however, that an allegation of third-party beneficiary status may be implied from the allegations that the regulatory agreement was made pursuant to 12 U.S.C. § 1713 and that the plaintiffs live in housing which is covered by § 1713 mortgage insurance, and will go on to consider the contract claim.

■ When a contract is in writing, the question whether a third party has enforceable contractual rights is largely a question of interpretation. 4 A. Corbin, *Corbin on Contracts* § 733 (1951). In this case, the court need not decide whether federal or state law controls the interpretation of the regulatory agreement,[20] since federal common law and New Jersey law do not conflict. Federal common law employs "the general principles that have evolved concerning the interpretation of contractual provisions." *United States v. Seckinger,* 397 U.S. 203, 210, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970). The general principle is that a third party acquires enforceable contract rights if the parties to the contract intended to confer a benefit upon him, but not if he benefits only incidentally from the contract. Restatement (Second) of Contracts §§ 302, 304, 315 (1981); Corbin, *supra,* §§ 773–777, 779C, 779G (1951). New Jersey law is the same. *See Dravo Corp. v. Robert B. Kerris, Inc.,* 655 F.2d 503, 510 (3d Cir.1981); *First National State Bank of New Jersey v. Commonwealth Federal Savings & Loan Ass'n,* 610 F.2d 164, 170 (3d Cir.1979); *Broadway Maintenance Corp. v. Rutgers, State University,* 90 N.J. 253, 259–60, 447 A.2d 906 (1982).

■ Although the Third Circuit has not engaged in any extended discussion of the precise issue before this court, in *Ellis v. HUD, supra,* 551 F.2d at 18, it rejected as "without merit" a third-party beneficiary claim that the plaintiff tenants attempted to assert under the mortgage insurance agreement entered into by their landlord and HUD pursuant to 12 U.S.C. § 1715k. Other courts that have considered this issue have concluded that tenants are not intended beneficiaries of the mortgage guarantee agreements between a landlord and HUD. *See Falzarano, supra,* 607 F.2d at 511 (mortgage insurance and subsidy under 12 U.S.C. § 1715*l*(d)(3)); *Harlib v. Lynn, supra,* 511 F.2d at 55–56 (same); *Carson v. Pierce,* 546 F.Supp. 80, 86–87

---

**20.** Generally, contract claims are governed by state law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where a contract "was entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution," however, federal law controls its interpretation. *United States v. Seckinger,* 397 U.S. 203, 209–10, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970) (footnote omitted); *see United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726–27, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979); *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 592, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973); *Jersey Cent. Power & Light Co. v. Local 327, IBEW,* 508 F.2d 687, 699 (1975), *vacated on other grounds,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976). *But cf. Miree v. DeKalb County,* 433 U.S. 25, 31, 97 S.Ct. 2490, 2494, 53 L.Ed.2d 557 (1977) (refusing to apply federal common law to third-party beneficiary claim that county had breached contracts with federal government, where "the litigation [was] among private parties and no substantial rights and duties of the United States hinge[d] on its outcome").

(E.D.Mo.1982) (mortgage insurance under 12 U.S.C. § 1713); *Fenner v. Bruce Manor, Inc.*, 409 F.Supp. 1332, 1349 (D.Md. 1976) (mortgage insurance under 12 U.S.C. §§ 1715*l*(d)(3), 1715z–1(e)). *Cf. Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 362 (5th Cir.1977) (HUD insured mortgage pursuant to 12 U.S.C. § 1715z; tenants held not to be third-party beneficiaries of any implied contract which HUD Handbook may have created between HUD and landlord).[21] In this case, the regulatory agreement is primarily a loan agreement and does not disclose an intent to benefit tenants except as they might be incidental beneficiaries.[22] Plaintiffs' contract claim against Associates must be dismissed for failure to state a claim.

## IV. CONCLUSION

Plaintiffs have stated neither a statutory nor a constitutional nor a contract claim. The entire complaint against the Secretary must be dismissed, pursuant to Fed.R. Civ.P. 12(b)(6). Associates' motion for judgment on the pleadings is granted. Plaintiffs' motion for reconsideration of their summary judgment motion is denied. Troy Towers Tenants Association's motion to intervene is denied.

---

**21.** In a number of other cases where plaintiffs have claimed to be third-party beneficiaries of HUD regulatory agreements governing matters other than mortgage insurance, the courts have reached the same result. *See Perry v. Hous. Auth.*, 664 F.2d 1210, 1218 (4th Cir.1981) (annual contributions contract for public housing, pursuant to 42 U.S.C. § 1437 *et seq.*); *Feldman v. HUD*, 430 F.Supp. 1324, 1328 (E.D.Pa.1977) (regulatory agreement pursuant to 12 U.S.C. § 1701q federal loan program); *Boston Pub. Hous. Tenants' Policy Council v. Lynn*, 388 F.Supp. 493, 496 (D.Mass.1974) (annual contributions contract for public housing). *But see Holbrook v. Pitt*, 643 F.2d 1261, 1269–73 (7th Cir.1981) (contract to provide rental assistance payments pursuant to 42 U.S.C. § 1437f).

**22.** Assuming *arguendo* that the regulatory agreement revealed an intent to confer a benefit on plaintiffs, the Restatement (Second) would still allow the court to refuse to recognize contractual rights in plaintiffs if such recognition "would contravene the policy of the law authorizing the contract or prescribing remedies for its breach." Restatement (Second) of Contracts § 313(1) (1981). Given the National Housing Act's strong policy in favor of encouraging private investment in housing, *see supra* pp. 723–724, and the likelihood that recognition of third-party contractual rights in tenants would deter private investment, the court would be inclined to find that recognition of such rights would contravene the policy of the Act. *Cf. Shivers v. Landrieu*, 674 F.2d 906, 912 (D.C.Cir.1981) (recognition of implied private right of action under 12 U.S.C. § 1743 [mortgage insurance for veterans] could impede rather than promote construction of housing); *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 361 (5th Cir.1977) (same, for 12 U.S.C. § 1715z mortgage insurance and subsidy program).